**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-02838-RBJ-NYW

JANOS TOEVS,

      Plaintiff,

v.

JAMES QUINN, First Assistant Attorney General,
CYNTHIA COFFMAN, Attorney General for the State of Colorado,
KEITH NORDELL, Legal Counsel for the Colorado Department of Corrections,
ADRIENNE JACOBSON, Legal Counsel for the Colorado Department of Corrections,
THERESA REYNOLDS, Legal Assistant for the Colorado Department of Corrections,
RICK RAEMISCH, Executive Director of the Colorado Department of Corrections,
TRAVIS TRANI, Warden of the Colorado State Penitentiary,
SEAN FOSTER, Associate Warden of the Colorado State Penitentiary,
CAROL SOARES, Associate Warden of the Colorado State Penitentiary,
FRANK ORTIZ, Litigation Coordinator of the Colorado State Penitentiary,
CHRIS BARR, Intelligence Lieutenant at the Colorado State Penitentiary,
DANIEL DENT, Intelligence Sergeant at the Colorado State Penitentiary,
RAEANNE WILL, Disciplinary Officer at the Colorado State Penitentiary, and
DALE BURKE, Hearing Officer at the Colorado State Penitentiary,

      Defendants.

---

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

---

Magistrate Judge Nina Y. Wang

      This civil action comes before the court on Defendants' "Motion to Dismiss or Motion for Summary Judgment." [#28, filed July 8, 2016]. The matter was referred to this Magistrate Judge pursuant to the Order Referring Case and memorandum dated September 1, 2016. [#34]. This court has reviewed the Motion, the entire case file, the applicable law, and the comments offered during the oral argument held January 12, 2017. Being fully apprised in the premises,

this court respectfully RECOMMENDS that the Motion be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Given the wide-ranging nature of the Amended Complaint and the myriad arguments presented in the briefing on the Motion to Dismiss, this court's discussion of Plaintiff's factual allegations is extensive.

**I.    Procedural History**

Plaintiff Janos Toevs ("Plaintiff" or "Mr. Toevs") is a prisoner in the custody of the Colorado Department of Corrections ("CDOC").  On December 30, 2015, Mr. Toevs, through his attorney Elisabeth Owen, filed a thirty-page Complaint naming various individuals affiliated with the Colorado Attorney General's office and the CDOC, and asserting eight claims for relief arising from the confiscation and review of certain of his legal materials and the subsequent charge and conviction for unlawful possession of other inmates' legal materials.  *See* [#1]. Those defendants filed a Motion to Dismiss on April 22, 2016, [#16], and in response Plaintiff filed an Amended Complaint on May 16, 2016, which remains the operative pleading.  *See* [#19].

The Amended Complaint names the following individuals as Defendants: James Quinn, Cynthia Coffman, Keith Nordell, Adrienne Jacobson, Theresa Reynolds, Rick Raemisch, Travis Trani, Sean Foster, Carol Soares, Frank Ortiz, Chris Barr, Daniel Dent, Raenne Will, and Dale Burke.  Defendant Quinn is a First Assistant Attorney General for the State of Colorado and Defendant Coffman is the Attorney General for the State of Colorado (collectively, the "AG Defendants").  Defendants Nordell and Jacobson are identified as former and current Directors of

the CDOC Office of Legal Services and Defendant Reynolds is the assistant to the Director of the CDOC Office of Legal Services. [#19 at 2]. Defendant Raemisch is the Executive Director of the CDOC. Defendant Trani is the Warden of the Colorado State Penitentiary ("CSP"), where Plaintiff was incarcerated at the time relevant to the allegations in the Amended Complaint, and Defendants Foster and Soares were the Associate Wardens of CSP during the time in question.[1] Defendant Ortiz was a Litigation Coordinator at CSP during the time in question; Defendant Barr was an Intelligence Lieutenant at CSP during the time in question; Defendant Dent was an Intelligence Sergeant at CSP during the time in question; Defendant Will is the Disciplinary Officer at CSP; and Defendant Burke was the Hearing Officer at CSP during the time in question. [#19 at 2-3]. Defendants Coffman and Jacobson are sued in their official capacity only. [#19 at ¶¶ 3, 5]. Defendants Raemisch, Dent, Will, and Burke are sued in their official and individual capacities. [*Id.* at ¶¶ 7, 13, 14, 15]. Defendants Quinn, Nordell, Reynolds, Trani, Foster, Soares, Ortiz, and Barr are sued in their individual capacity only. [*Id.* at ¶¶ 2, 4, 6, 8, 9, 10, 11, 12].

Plaintiff asserts nine claims in all and seven claims against Defendants as a group: (1) Retaliation for Exercise of Protected Rights to Access the Court in Violation of the First Amendment; (2) Conspiracy to Obstruct Justice in Violation of 42 U.S.C. § 1985; (3) Deprivation of Property Without Due Process in Violation of the Fourteenth Amendment; (4) Denial of Right to Counsel in Violation of the Sixth Amendment; (5) Breach of Attorney-Client Privilege in Violation of First Amendment; (6) Denial of Right to Privacy in Violation of the

---

[1] In March 2016, Defendant Foster was promoted to Warden of the Arkansas Valley Correctional Facility, and Plaintiff was transferred there shortly after Defendant Foster's promotion. [#19 at ¶ 9].

Fourth Amendment; and (7)  Denial of Right to Access the Courts in Violation of the First Amendment.  [#19 at 23-33].  He brings all but the second claim pursuant to 42 U.S.C. § 1983. The Eighth Claim for Cruel and Unusual Punishment in Violation of the Eighth Amendment is also brought pursuant to section 1983 and is asserted against Defendants Raemisch, Trani, Foster, Barr, and Dent.  The Ninth Claim for Malicious Prosecution in Violation of Colorado Common Law is asserted against Defendants Quinn, Dent, Foster, Trani, and Raemisch.  [*Id.* at 33-34].    The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

## II.    Factual Allegations

At the core of Mr. Toevs's pleading lie allegations that CDOC employees and employees of Colorado's Attorney General are improperly confiscating and reading prisoners' protected legal materials, and that the lack of policy or directive prohibiting this conduct, or that a culture that condones this conduct, results in chilling prisoners' efforts to engage in constitutionally protected behavior, particularly in seeking access to the courts.  The following factual allegations are taken as true for the purposes of this Motion.

### A.    The *Milyard* Appeal and *CLCP v. Herrera*

In September 2012, Mr. Toevs filed a lawsuit pursuant to 42 U.S.C. § 1983 alleging in relevant part that intelligence staff's ("Intel") mismanagement resulted in violence at the Sterling Correctional Facility ("SCF").  [#19 at ¶ 19].  The complaint filed in that matter, *Toevs v. Milyard, et al.*, Civil Action No. 12-cv-02532-REB-MEH, asserted that Intel arbitrarily implemented security threat group ("STG") classification as retaliation against prisoners "who spoke out against the policies and practices of SCF," and "as a coercive force to silence prisoner

speech." [*Id.* at ¶¶ 20-22]. In November 2013, the *Milyard* court granted summary judgment for defendants, for which Plaintiff sought review in the Tenth Circuit Court of Appeals, Case No. 13-1476. [*Id.* at ¶ 23].

Ms. Owen, Plaintiff's attorney here, was simultaneously pursuing a lawsuit in El Paso County District Court, captioned *Colorado Prison Law Project v. Herrera, et al.*, Case No. 13CV300363 ("*CPLP v. Herrera*"), in large part to obtain intelligence files containing STG classifications of certain of her clients. [#19 at ¶¶ 24, 25]. Plaintiff was aware of the lawsuit and this specific objective, but was not a party to that action. [*Id.* at ¶ 25]. The *CPLP v. Herrera* complaint alleged that Intel, including Defendants Barr and Dent, refused to provide intelligence files to Ms. Owen in violation of the Colorado Criminal Justice Records Act. [*Id.* at ¶ 25]. All the filings in *CPLP v. Herrera* were accessible to the public and no protective order was on file. [*Id.* at ¶ 26]. During the pendency of *CPLP v. Herrera*, Plaintiff discussed with Ms. Owen the prospect of her representing him in several matters, including a bid for clemency. Plaintiff ultimately retained Ms. Owen to represent him in this endeavor. [*Id.* at ¶ 27].

In June 2013, Ms. Owen mailed to Plaintiff a copy of the *CPLP v. Herrera* complaint, which he received through the CSP legal mail program as governed by CDOC Administrative Regulation ("AR") 300-38. AR 300-38 states:

> Restricted Inspection Mail: All incoming and outgoing offender mail to or from a specified class of persons and organizations, which DOC employees, contract workers, and volunteers are prohibited from reading to protect confidentiality, but are permitted to inspect for contraband in the offender's presence.
>
> …
>
> The DOC shall ensure and facilitate offender access to counsel and assist offenders in making confidential contact with attorneys and their authorized representatives; such contact includes, but is not limited to uncensored

correspondence. [4-4275] To be considered a confidential contact from an attorney, their authorized representative, or legal aid organization, the incoming mailing envelope must include the following:

a. Attorney's first and last name;
b. Attorney's registration, bar, or license number….;
c. Attorney's complete business address;
d. Mailing envelope must be clearly marked "PRIVILEGED" or "CONFIDENTIAL."

[#19 at 5-6]. Plaintiff placed the *CPLP v. Herrera* complaint in his legal box, which, pursuant to CDOC policy, may only be "searched in the presence of the offender," and, even then, "attorney-client privileged documents shall not be read, but only searched for contraband." [*Id.* at ¶ 30]. Plaintiff used his legal box to store Ms. Owen's other correspondence, the majority of which pertained to his clemency bid. [*Id.* at ¶ 31]. All correspondence from Ms. Owen to Plaintiff was clearly marked "Privileged and Confidential" and met all other requirements for protecting confidentiality prescribed by the CDOC ARs. [*Id.* at ¶ 32].

### B.  Search of Mr. Toevs's Legal Box

In December 2013, while Plaintiff's *Milyard* appeal was pending, unnamed CDOC officers removed Plaintiff from the CSP incentive unit (where he was housed as a reward for good behavior), relocated him to a "strip cell," required him to disrobe, and performed a body cavity search.[2] [#19 at ¶¶ 34, 36]. Defendant Dent then carried Plaintiff's legal box to the strip cell where he searched the contents and "read every paper…word for word, line by line." [*Id.* at ¶¶ 37, 38]. Defendant Barr joined him and "also began a word for word reading of each piece of

---

[2] Strip cells, which are customarily used for "extreme punitive segregation cases," are smaller than normal prison cells and devoid of a mattress, pillow, bedding, or any other accommodation. Rather, they provide a bare metal bunk and stainless steel toilet and sink. [#19 at ¶ 35].

paper in Toevs' legal box." [*Id.* at ¶ 39]. "CDOC ARs specifically prohibit CDOC staff from reading documents in legal boxes." [*Id.* at ¶ 38].

Among other materials stored in Plaintiff's legal box, Defendants Dent and Barr read letters between Plaintiff and numerous attorneys, including lawyers from the Civil Rights Clinic at the University of Denver, the American Civil Liberties Union, and the Colorado Prison Law Project. The CDOC officially recognizes these organizations as providing legal services to prisoners, and that communications between prisoners and these organizations are entitled to confidential and privileged treatment. [#19 at ¶ 40]. Defendants Dent and Barr also read letters addressed from Ms. Owen to Plaintiff, which were contained in an envelope labeled with Ms. Owen's full name, attorney registration number, the words "privileged and confidential," and the words "legal mail" (the "Owen Letters"). [*Id.* at ¶ 43]. Finally, Defendants Dent and Barr read the unfinished Tenth Circuit appellate brief that Plaintiff was in the process of finalizing. [*Id.* at ¶ 41]. Defendants Dent and Barr then removed the legal box and all its contents from the strip cell. [*Id.* at ¶ 44].

On January 8, 2014, Defendant Dent returned to Plaintiff the legal box and most of its contents, along with a shakedown slip identifying items that Dent and Barr had confiscated: "7 legal letters and 4 legal folders." [#19 at ¶ 45 (quotations omitted)]. These 7 legal letters and 4 legal folders consisted of correspondence from Ms. Owen to Plaintiff and related enclosures. These confiscated materials included the *CPLP v. Herrera* complaint and exhibits thereto, which Ms. Owen had mailed to Plaintiff for the *Milyard* case. [*Id.* at ¶¶ 50, 51].

Defendants Dent and Barr forwarded the Owen Letters to Defendant Ortiz, who was responsible, as CSP litigation coordinator, for providing information to the Office of the

Attorney General about CDOC's defense in any litigation brought against the Department or its agents by a CSP prisoner. [#19 at ¶ 52]. Defendant Ortiz read the Owen Letters before forwarding them to Defendants Nordell and Reynolds in the CDOC Office of Legal Services. [*Id.* at ¶ 53]. Defendants Nordell and Reynolds in turn read the Owen Letters before sending them to Defendant Quinn, the First Assistant Attorney General responsible for supervising the Office of the Attorney General's Corrections Unit, which is the unit that defends CDOC and its agents in litigation brought by prisoners, including Plaintiff's *Milyard* appeal. [*Id.* at ¶ 54]. Upon receipt, Defendant Quinn read the Owen Letters and advised Defendants Nordell, Reynolds, Ortiz, Barr, and Dent that he would confiscate four of the items, which were exhibits to the *CPLP v. Herrera* complaint, on the basis that Plaintiff had no "compelling interest" in those documents and should not be in possession of them.

Meanwhile, unnamed CDOC officers had transferred Plaintiff to an intake cell after he had spent approximately eight hours in the strip cell. [#19 at ¶ 56]. He remained in the intake cell, also used for "extreme segregation cases," for three days, allowed to wear only his underwear, before he was transferred to a standard segregation cell, where he remained under punitive segregation conditions until January 23, 2014. [*Id.* at ¶¶ 56, 57]. During this time he was denied access to outdoor exercise. [*Id.* at ¶ 58].

After learning of these events, Ms. Owen contacted CSP on January 3, 2014 regarding the decision to place Plaintiff into segregation and search his legal materials. [#19 at ¶ 60]. Ms. Owen spoke first with Defendant Dent, who informed her that Plaintiff was under investigation for "possession of other offenders' legal work." [*Id.*] Ms. Owen next spoke with Defendant Foster, to whom she complained that his actions and those of his staff were not legal. [*Id.*].

Defendant Foster responded that Defendant Ortiz had taken possession of Plaintiff's legal materials and given them to Defendant Quinn and the Office of Legal Services, Quinn was overseeing the "investigation," and Foster and his staff were awaiting instructions from Quinn. [*Id.*] Ms. Owen again contacted Defendants Foster and Ortiz, as well as Defendants Trani and Quinn, by email to complain that they were violating Plaintiff's clearly established constitutional rights and to demand they return Plaintiff's legal material. [*Id.* at ¶ 61]. Defendant Foster responded to Ms. Owen's e-mails as follows:

> Ms. Owen, the Attorney General's Office is fully aware of all aspects of our investigation. Mr. Toeves [sic] will remain on removal from population status and we will follow the AGs direction pertaining to his legal material. Mr. Ortiz will review the other details of your request. No one's rights have been violated.

[#19 at ¶ 62].

> On January 7, 2014, Defendant Dent transmitted the following email to Defendant Trani:

> During a [telephone] call Toevs informed the called parties that Owen had sent him a printed copy of an NPR story. The NRP information regarding copyright protection can be found here: http://www.npr.org/about-npr/17896898/terms-of-use[.] I am not certain the NPR story is part of the materials that were confiscated, but it is very likely. I have monitored all of Toevs calls going back to 9/1/13. I will complete a supplement to the threat assessment tomorrow that includes all pertinent information from those calls.

[#19 at ¶ 63]. Within hours, Defendant Trani responded and directed Defendant Dent to forward the information to Defendant Quinn. [*Id.* at ¶ 64].

On January 15, 2014, Ms. Owen sent an email to Defendant Quinn demanding he return, or facilitate the return, of Plaintiff's legal materials and instruct his clients to drop the "Unauthorized Possession" charge she believed CDOC had brought against Plaintiff. [#19 at ¶ 65]. CDOC had not charged Plaintiff at that time. As of the date Plaintiff initiated this action, Quinn had not responded to Ms. Owen's January 15, 2014 email. [*Id.* at ¶ 69]. Later in the day

on January 15, 2014, Defendant Will served Plaintiff with a write-up for Unauthorized

Possession.  [*Id.* at ¶ 68].  The notice advising Plaintiff of the charge against him read as follows:

> On January 8, 2014 at approximately 1442 hours Sgt. Dent completed an investigation of potentially questionable "legal" materials found in the possession of Offender Toevs, Janos #63992 E7/14 CSP. Offender Toevs was placed on RFP or Removal From Population status pending an investigation by CSP Intel based on information that they received. As part of the investigation, a property search was conducted in full view of the offender. Several questionable legal items were found in the offender's legal box. The items were scanned, not read for content, and delivered to the Facility Legal Liaison for further review. Upon further review by the Office of Legal Services and the Office of the Attorney General, four items were deemed as contraband. Offender Toevs was found to possess four items, labeled: exhibit 5, exhibit 6, exhibit 7 and exhibit 8, that were identified by the Office of the Attorney General as [i]tems Offender Toevs did not have authorization to possess. Two of these items specifically verify that the Colorado Department of Corrections (CDOC) is tracking the Security Threat Group (STG) status of specific offenders. To provide STG information about offenders to another offender creates a potential threat to the safety and security of CDOC [e]mployees, [o]ffenders[,] and facilities. Offender Toevs is not included in this list of offenders and has no compelling reason to possess the exhibits. According to AR 750-01 titled Legal Access, "Offenders may provide assistance to one another; however, time, place, and manner will be regulated. When legal documents are being prepared, exchanged inside or outside the law library, all involved offenders must be present. Offenders are required to return all documents to their owner before parting company. Offenders are allowed to maintain only their own legal work in their personal possession or in their cells." The 4 exhibits were entered into evidence. Offender Toevs was not authorized to possess the 4 exhibits of documentation as the items were deemed contraband.

[#19 at ¶ 70].

CDOC held a hearing on the Unauthorized Possession charge on January 17, 2014.

Defendant Will prosecuted the case and Defendant Burke adjudicated the matter.  [*Id.* at ¶ 73].

Plaintiff pled not guilty to Unauthorized Possession and testified that Ms. Owen "had properly

sent him the documents he was charged with possessing without authorization."  [*Id.* at ¶ 74].

For the prosecution, Defendant Will reasserted that Plaintiff had violated AR 750-01:

> Offenders may provide assistance to one another; however the time, place, and manner will be regulated. When legal documents are being prepared, exchanged inside or outside the law library, all involved offenders must be present. Offenders are required to return all documents to their owner before parting company. Offenders are allowed only to maintain their own legal work in their personal possession or their cells.

[*Id.* at ¶ 76].  Plaintiff maintained there was no evidence that he was in possession of another offender's legal work.  [*Id.* at ¶ 77].  Defendant Burke accepted as true that Plaintiff received the documents at issue from his attorney, but nonetheless found Plaintiff guilty of Unauthorized Possession, stating, "Report by Sgt. Dent stating Toevs possessed legal papers that the State Office of the Attorney General said he was not authorized to possess, copy of these papers."  [*Id.* at ¶¶ 80, 82].  Neither Defendant Burke nor Will identified the *CPLP v. Herrera* complaint and exhibits thereto as confidential during the course of the hearing.  [*Id.* at ¶ 81].  Defendant Burke sentenced Plaintiff to thirty days' loss of good time, which did not take into consideration the twenty-four days that Plaintiff had already spent in segregation, which he asserts was, at the time, nine days longer than the Code of Penal Discipline sanctions for punitive segregation.  [*Id.* at ¶ 83].  As a result of the conviction, Defendant Trani removed Plaintiff from his incentive pod status and Plaintiff lost his eligibility, for two years, to petition the governor for commutation of his life sentence.  The loss of eligibility "render[ed] the previous twelve years of Toevs' display of good behavior irrelevant for purposes of his clemency bid."  [*Id.* at ¶ 88].  On January 22, 2014, Plaintiff appealed the conviction pursuant to CDOC regulations.  Defendant Soares upheld the conviction on February 19, 2014.  [*Id.* at ¶ 90].

Plaintiff thereafter retained Ms. Owen to appeal the conviction to the Fremont County District Court, naming Trani and Raemisch as defendants.  [#19 at ¶ 91 (citing Case No. 14CV30069)].  The district court affirmed the conviction and Plaintiff appealed that decision to

the Colorado Court of Appeals.  On January 14, 2016, the Colorado Court of Appeals found in relevant part that "[n]o direct evidence was presented at the disciplinary hearing that the AG actually deemed the documents contraband and, if so, why," and reversed the district court's finding "that there was some evidence to support CDOC's Unauthorized Possession conviction," and remanded the matter to the district court with instructions to reverse Toevs's disciplinary conviction.  [*Id.* at ¶¶ 97, 98 (quotation marks omitted)].  Defendant Trani subsequently expunged the conviction from Plaintiff's CDOC record.  [*Id.* at ¶ 99].  However, no one has returned Plaintiff to his incentive pod status or returned to him the confiscated *CPLP v. Herrera* complaint and exhibits.  [*Id.* at ¶¶ 101, 102].

## III.    Conspiracy Allegations

Plaintiff alleges that he intended to argue to the Tenth Circuit that "CDOC's characterization of the grievance process in *Toevs v. Milyard* was intentionally fraudulent—a fact not only known to, but actually enabled by, the AG's Office," thereby accusing CDOC officials of perjury and the AG's Office of "repeated Rule 11 violations."  [#19 at ¶¶ 106, 107]. Plaintiff intended to use the *CPLP v. Herrera* exhibits to support the allegation that "CDOC officials conspire with the AG's Office to intentionally deceive the courts by misrepresenting the factual circumstances of prison life—including what is and is not an available remedy."  [*Id.* at ¶ 108].  For example, Plaintiff alleges, "[a]s a matter of policy and practice, CDOC makes its grievance process completely unavailable to prisoners, frustrating their ability to exhaust their administrative remedies as required by the Prison Litigation Reform Act, thereby setting up the AG's arguments in litigation that a prisoner has failed to exhaust."  [*Id.* at ¶ 120].

Defendants filed the pending Motion on July 8, 2016.   [#28].   Following multiple requests for extensions of time from both sides, the Parties completed briefing on October 12, 2016.  *See* [#33; #40].  This court set a Motion Hearing to be held December 6, 2016, and later reset the hearing to January 12, 2017 at Plaintiff's request.  *See* [#41, 44].  On that date, this court heard oral argument from both counsel and took the matter under advisement.  *See* [#46].

## LEGAL STANDARDS

### I.   Fed. R. Civ. P. 56

Defendants argue that the court should dismiss Plaintiff's Amended Complaint and enter summary judgment in their favor because Plaintiff failed to exhaust the available administrative remedies.  [#28 at 11].  A prisoner's failure to exhaust administrative remedies is an affirmative defense that the defendant must raise, and thus the question of exhaustion is not amenable to disposition on a Rule 12(b)(6) motion.  *See Jones v. Bock*, 549 U.S. 199, 216 (2007).  Therefore, I will consider the issue of exhaustion pursuant to Rule 56, and otherwise apply Rule 12(b) standards to Defendants' other arguments.

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co., Inc.,* 41 F.3d 567, 569 (10th Cir. 1994).  "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 249 (1986)).  Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission

to a jury or conversely, is so one-sided that one party must prevail as a matter of law. *Anderson,* 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Service,* 812 F.2d 621, 623 (10th Cir. 1987). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party. *Anderson,* 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Service Com*, 391 U.S. 253, 289 (1968)).

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670–71 (10th Cir. 1998) (citing *Celotex,* 477 U.S. at 323). The movant can achieve this by pointing the court to a lack of evidence for the nonmovant on an essential element of the nonmovant's claim. *Id.* at 671. Once the movant meets this initial burden, the nonmovant assumes the burden to put forth sufficient evidence to demonstrate the essential elements of the claim such that a reasonable jury could find in its favor. *See Anderson*, 477 U.S. at 248; *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1326 (10th Cir. 1999). Conclusory statements based merely on speculation, conjecture, or subjective belief are not competent summary judgment evidence. *See Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir. 2004). The nonmoving party's evidence must be more than "mere reargument of [her] case or a denial of an opponent's allegation," or it will be disregarded. *See* 10B Charles Alan Wright, et al., Federal Practice and Procedure § 2738 at

356 (3d ed.1998). *See also Sartori v. Susan C. Little & Assocs., P.A.*, 571 F. App'x 677, 680 (10th Cir. 2014).

## II.     Fed. R. Civ. P. 12(b)(1)

Defendants also argue under various theories of immunity that the court is divested of subject matter jurisdiction over the claims asserted against them.   Federal courts, as courts of limited jurisdiction, must have a statutory basis for their jurisdiction.   *See Morris v. City of Hobart*, 39 F.3d 1105, 1111 (10th Cir. 1994) (citing *Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994)).   Pursuant to Federal Rule of Civil Procedure 12(b)(1), the court may dismiss a complaint for lack of subject matter jurisdiction.   The determination of a court's jurisdiction over subject matter is a question of law.   *Madsen v. United States ex. U.S. Army, Corps of Engineers*, 841 F.2d 1011, 1012 (10th Cir. 1987).   "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking."   *Basso v. Utah Power & Light Co.,* 495 F.2d 906, 909 (10th Cir. 1974).

## III.    Fed. R. Civ. P. 12(b)(6)

Finally, Defendants argue that Plaintiff fails to state a cognizable claim.   Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."   Fed. R. Civ. P. 12(b)(6).   In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations…and view these allegations in the light most favorable to the plaintiff."   *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).   However, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do."   *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir. 2008) (citation omitted).  "The burden is on the plaintiff to frame 'a complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Id.*  The ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## ANALYSIS

I.   **Exhaustion of Administrative Remedies**

A.     **Applicable Law and Regulations**

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e *et seq.*, bars prisoner suits regarding prison conditions if the prisoner has failed to exhaust the prison's administrative remedies.  42 U.S.C. § 1997e(a).  *See Jones*, 549 U.S. at 204.  Exhaustion of administrative remedies is mandatory under the PLRA and "unexhausted claims cannot be brought in court." *Thomas v. Parker,* 609 F.3d 1114, 1117 (10th Cir. 2010).  "An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim under PLRA for failure to exhaust his administrative remedies. The doctrine of substantial compliance does not apply." *Thomas,* 609 F.3d at 1118 (citation, quotations, and brackets omitted).

Exhaustion of administrative remedies under the PLRA is a question of law for the court to decide. *Saleh v. Wiley*, No. 09–cv–02563–PAB–KLM, 2012 WL 4356219, at *1 (D. Colo. Sept. 24, 2012) (citing *Drippe v. Tobelinski*, 604 F.3d 778, 782 (3d Cir. 2010)).

The requirements necessary for exhaustion are set forth in each prison system's grievance procedure, and the prisoner must follow the specified process to properly exhaust his remedies. *Little v. Jones,* 607 F.3d 1245, 1249 (10th Cir. 2010) (citation omitted). The CDOC process for exhausting administrative remedies is set out in AR 850-04. *See* [#28 at 11; #33-2]. Prisoners shall utilize the grievance procedure "for a broad range of complaints including, but not limited to: policies and conditions within the facility that affect the offender personally; actions by employees and offenders; incidents occurring within the facility that affect the offender personally and for resolving offender issues relating to health care concerns." [#33-2 at 4] (emphasis omitted). Pursuant to this Regulation, and as is relevant here, the prisoner must file a Step 1 Grievance within thirty calendar days from the date he knew or should have known of the facts giving rise to the grievance. [#28-1 at ¶ 6; #33-2 at 3]. The prisoner must include the following detail:

> Each grievance shall address only one problem or complaint and include a description of the relief requested. Problems that arise from the same incident or set of facts shall be grieved in one grievance, even though it may involve multiple DOC employees, contract workers, or volunteers… The grievance shall clearly state the basis for the grievance and the relief requested in the space provided on the form.

[#33-2 at 5]. CDOC officials are required to respond to the Step 1 Grievance within twenty-five calendar days of receiving it. [*Id.* at 8]. If dissatisfied with the response, the prisoner must file a Step 2 Grievance within five days of receiving the response. [#28-1 at ¶ 8]. CDOC officials then must respond within twenty-five calendar days of receiving the Step 2 Grievance. [#33-2 at

8].  If the prisoner is dissatisfied with the Step 2 response, he must then file a Step 3 Grievance within five days.  [#28-1 at ¶ 9].  The Step 3 Grievance is the final step in the CDOC grievance process, and the grievance process does not conclude until the prisoner has completed all three steps.  [#28-1 at ¶ 10].  The Regulation specifies that, "[i]n the event the time limit concerning any step of the process expires without a response, the offender may proceed to the next step within five calendar days of the date the response was due."  [#33-2 at 8].

### B.        The Parties' Arguments

Defendants argue that Plaintiff did not file a Step 3 Grievance concerning any of the claims asserted in his Amended Complaint and thus he failed to exhaust his administrative remedies as to all claims prior to filing this lawsuit.  [#28 at 11-12; #28-1].  Plaintiff contends to the contrary that he filed Step 1, 2, and 3 Grievances regarding the conduct giving rise to the claims asserted here.  He also contends that the CDOC failed to timely respond to his Step 1 Grievance, which relieved him of the obligation of filing Step 2 and 3 Grievances, but that in an abundance of caution he filed Step 2 and 3 Grievances.  [#33 at 5-6].

In support of their argument, Defendants attached the declaration of Anthony DeCesaro, who serves as a CDOC Step 3 Grievance Officer.  [#28-1].  Mr. DeCesaro attests that he investigates and answers inmates' Step 3 Grievances and is the custodian for those grievances. [*Id.* at ¶ 2].  Upon review of the CDOC's grievance records, Mr. DeCesaro attests that Plaintiff did not file a Step 3 Grievance in 2013 or 2014 relating to allegations that he was improperly denied the opportunity to exercise outdoors or that CDOC officers violated his First, Eighth, and Fourteenth Amendment rights by infringing his right to privacy, right to counsel, right to access

the courts, and in obstructing justice.  [*Id.* at ¶¶ 13, 14].  Mr. DeCesaro attests that Plaintiff "has

not filed a Step 3 grievance of any kind after they year [sic] 2012."  [*Id.* at ¶ 14].

In support of his Response, Plaintiff attached his declaration, which references his Step 1

Grievance.  That grievance reads as follows:

> On 12-30-13 I was RFP'd. My legal materials, confidential attorney mail and
> work product[,] were read and confiscated. On 1-8-14 I was informed the AG said
> I couldn't possess items clearly and specifically allowed by DOC ARs. On 1-15-
> 14 I was informed in addition to Intel and the AG, Legal Services and the Legal
> Liason [sic] had read the aforementioned material. All of my legal work was not
> returned. These actions constitute a violation of attorney/client privilege,
> retaliation for accessing the courts and a violation of due process in violation of
> my 1st and 14th Amendment rights.  My being RFP constitutes false
> imprisonment. Being RFP like this and taking my legal material constitute
> outrageous conduct on behalf of DOC and the AG. I request DOC policies be
> rewritten to prevent anything like this in the future. I further request I never be
> subjected to this treatment again.

[#33-1 at 4, ¶ 16 and at 17].[3]  Plaintiff's declaration also references Defendant Barr's response to

the Step 1 Grievance, which states:

> Your legal work was not read, it was scanned for content. Your legal box was
> searched in your presence. You were RFP'd pending investigation for a
> conversation visiting staff overheard in the visiting room which constituted a
> serious breach of security. The Department of Corrections can and will react to
> potential security concerns. As for what the Attorney General says you can or
> cannot have, you will have to address that with them.

[#33-1 at 5, ¶ 17 and at 17].  Plaintiff attests that although he submitted the Step 1 Grievance on

February 4, 2014, he did not receive Defendant Barr's response until March 12, 2014.  [#33-1 at

5, ¶ 18 and at 17].  Once he received the response, he filed a Step 2 Grievance.  [#33-1 at 5, ¶

18].  He did not receive a response to his Step 2 Grievance, but nonetheless filed a Step 3

Grievance.  [*Id.*]  Plaintiff attests that, because CDOC did not respond to the Step 2 and 3

---

[3] Counsel indicated during oral argument that "RFP'd" is an acronym for "removed from
population."

Grievances, he cannot produce copies of those grievances, because such copies are available only as attached to CDOC responses.  [#33-1 at ¶ 19].  Plaintiff also argues, in response to Mr. DeCesaro's declaration, that he has filed multiple Step 3 Grievances since 2012 and that Mr. DeCesaro's report that CDOC records contain no Step 3 grievances since 2012 signed by Plaintiff "may read to a jury as evidence that Mr. Toevs has filed none [or] it may, on the other hand, demonstrate that CDOC has been 'losing' Mr. Toevs' step three grievances since 2012 in order to prevent him from ever winning a lawsuit again."  [#33 at 6].[4]  Finally, Plaintiff contends that the CDOC grievance procedure does not apply to the Office of the Attorney General, and thus Defendants Coffman and Quinn are not entitled to summary judgment on the exhaustion issue, and that his ninth claim for Malicious Prosecution in violation of Colorado common law is not subject to the PLRA.  [#33 at 6-7].

## C.      Factual Findings and Conclusions of Law

In light of Defendants' two-pronged argument that the Step 1 Grievance does not assert allegations related to the claims at issue here and Plaintiff failed to file Step 2 and 3 Grievances, I first consider whether the Step 1 Grievance provided enough information to provide sufficient notice to Defendants of Plaintiff's allegations giving rise to his nine claims for relief.   My analysis begins with CDOC's grievance procedure, which requires prisoners to "clearly state the basis for the grievance and the relief requested."  [#33-2 at 5, § IV.D.9(b)].  I note, however, that the regulations do not require prisoners to specifically identify the wrongdoers.  *Green v. Federal Bureau of Prisons*, No. 07–cv–1011–DME–MEH, 2009 WL 150650, at *7 (D. Colo. Jan. 21,

---

[4] In 2011, Plaintiff proceeding *pro se* prevailed in a lawsuit against the CDOC that resulted in the Department revising its solitary confinement process.  [#33 at 6; #33-1 at ¶ 9; #33-3 at 12-13; #33-4 (AR 650-03) at §§ III.L, IV.G.5, IV.J.4; #33-5].  *See also Toevs v. Reid*, 685 F.3d 903, 911-15 (10th Cir. 2012).

2009) (quoting *Kikumura v. Osagie*, 461 F.3d 1269, 1284 (10th Cir. 2006) (recognizing that inmates typically file their grievances *pro se* and subject to page and time limitations), *overruled in part on other grounds as recognized in Robbins v. Oklahoma,* 519 F.3d 1242, 1246–47 (10th Cir. 2008).[5]

It is indisputable that Plaintiff's Step 1 Grievance relates to the events described in the Amended Complaint, the first of which occurred in December 2013 when Defendants Barr and Dent searched Plaintiff's legal box and confiscated certain materials.  Moreover, Plaintiff clearly stated his belief that the search and confiscation constituted a violation of his attorney/client privilege, unlawful retaliation in violation of his First Amendment rights, and deprivation of property without due process in violation of his Fourteenth Amendment rights.  [#33-1 at 5, ¶ 17 and at 17].  I further find that the allegations contained in the Step 1 Grievance provide sufficient notice to Defendants that Plaintiff believed those involved in the reading and confiscation of his legal materials had interfered with his right to counsel as protected by the Sixth Amendment and violated his right to privacy as protected by the Fourth Amendment.  Indeed, Plaintiff grieved that "confidential attorney mail" was among the materials read and confiscated, and alleges in his pleading that Defendants read communications between him and his attorney that were marked as privileged and confidential.  *See, e.g.,* [#19 at ¶¶ 31, 32].  He also alleges:

> [b]y implementing administrative regulations that prohibit prison staff from reading mail to prisoners from lawyers, and by permitting prisoners to keep such mail in legal boxes specifically used to contain and identify confidential legal materials, CDOC created a reasonable expectation of privacy in the content of

---

[5] The *Green* and *Kikumura* courts examined exhaustion as required by the Bureau of Prisons; however, the PLRA regulations apply with equal force to the CDOC exhaustion procedure, which likewise imposes page and time limitations for filing grievances.  *See* [#33-2 at §§ IV.D.9(b) and F(1)].

properly marked communications between prisoners and their lawyers stored in prisoners' legal boxes.

[#19 at ¶ 164].  *See Rainge-El v. Moschetti*, No. 05–cv–01831–PSF–CBS, 2006 WL 1876632, at *3 (D. Colo. Jul. 5, 20016) ("Recognizing that administrative grievances are written *pro se* by prisoners who may have limited skills in writing, with little or no expertise or access to experts in the law, this Court must give the language used by these inmates a liberal construction as it would with any *pro se* pleading in federal court") (citations omitted).  Finally, Plaintiff states unequivocally that he wants CDOC to revise its policies so that he is not subjected to similar treatment in the future.  This constitutes much of the same relief he now seeks.  *See* [#19 at 35].  I find that the Step 1 Grievance adequately informed Defendants of the allegations that now underpin Claims One, Three, Four, Five, and Six.[6]  *See Rainge-El*, 2006 WL 1876632, at *2 (citing *Sulton v. Wright,* 265 F. Supp. 2d 292, 298 (S.D.N.Y. 2003) (finding compliance with the PLRA, "[s]o long as the prisoner's grievance 'present[s] the relevant factual circumstances giving rise to a potential claim…sufficient under the circumstances to put the prison on notice of potential claims and to fulfill the basic purposes of the exhaustion requirement...'")).  Moreover, Defendant Barr's response to the Grievance indicates an understanding of Plaintiff's contentions.  *Id.* at *3.

However, I find that the Step 1 Grievance did not provide sufficient notice to Defendants with respect to the Second, Seventh, and Eighth Claims.  The Grievance makes no mention of any pending lawsuit, nor does it include allegations that Defendants, by reading and/or

---

[6] These claims assert, respectively, Retaliation in Violation of the First Amendment, Deprivation of Property Without Due Process in Violation of the Fourteenth Amendment, Denial of Right to Counsel in Violation of the Sixth Amendment, Breach of Attorney-Client Privilege in Violation of First Amendment, and Denial of Right to Privacy in Violation of the Fourth Amendment.

confiscating the legal materials, interfered with a civil action to which Plaintiff was a party or prevented Plaintiff from pursuing a lawsuit. Yet, in support of his Second Claim for Conspiracy to Obstruct Justice in Violation of 42 U.S.C. § 1985, Plaintiff alleges that "[o]bstructing justice includes intimidating a party in any court of the United States," and that Defendants "conspired and worked in concert to obstruct justice by intimidating Toevs when he was a party in a court of the United States." [#19 at ¶¶ 129-134]. In support of his Seventh Claim for Denial of Right to Access the Courts in Violation of the First Amendment, Plaintiff alleges that "taking of a prisoner's legal papers is a constitutional violation when it infringes on his right to access the courts" and "[t]he right to access the courts is violated when prison officials deprive a prisoner the ability to prepare his court pleadings." [#19 at ¶¶ 168-172]. The Grievance did not put Defendants on notice of these potential claims. *Cf. Soto v. Warden of Salinas Valley State Prison*, No. 15-02024 BLF (PR), 2016 WL 3661384, at *6 (N.D. Cal. Jul. 1, 2016) (plaintiff failed to exhaust his administrative remedies where his grievances, even when construed liberally, did not discuss or mention any claim of conspiracy). Additionally, while Plaintiff described his removal from population as "false imprisonment" and asserts that the CDOC and AG are liable for outrageous conduct due to the confiscation of his legal materials, the Step 1 Grievance does not include allegations regarding the denial of outdoor recreation while he was segregated from general population, which is the basis of his Eighth Claim. "Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." *Jones*, 549 U.S. at 204. The Step 1 Grievance did not provide sufficient detail to allow Defendants to address Plaintiff's complaint

that their actions had prevented him from accessing the courts, resulted in the obstruction of justice, and subjected him to cruel and unusual punishment.

Next, with respect to Plaintiff's Ninth Claim for Malicious Prosecution, Plaintiff asserts this claim pursuant to Colorado state law rather than § 1983. Therefore, I agree with Plaintiff that the claim falls outside of the PLRA, which requires inmates to exhaust available remedies prior to filing an action under § 1983. *See Torres v. Corrections Corporation of America*, 372 F. Supp. 2d 1258, 1263 (N.D. Okla. 2005) (holding plaintiff's state law claim of negligence did not fall "within the ambit of 42 U.S.C. § 1997e(a)")). *See also Mitchell v. Brown & Williamson Tobacco Corp*, 294 F.3d 1309, 1315-16 (11th Cir. 2002) (holding the PLRA does not apply to actions removed from state court that are unrelated to prison conditions); *McDaniel v. Meisner*, 617 F. App'x 553, n.3 (7th Cir. 2015) ("We note that the exhaustion requirements of the Prison Litigation Reform Act do not apply to state-law claims.") *But see Arnold v. Sainvil*, NO. 15-20973-CIV-GAYLES/WHITE, 2016 WL 1211013, at *3 (S.D. Fla. Mar. 29, 2016) (declining to address whether the PLRA applies to supplemental state law claims brought in federal court, noting that the law is unclear).

Finally, I respectfully disagree with Plaintiff that he is not required to exhaust his administrative remedies as to Defendants Coffman and Quinn. The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The plain language of the statute demonstrates that its application is triggered by the confinement of the plaintiff and the type of claim asserted, as opposed to the type of defendant against whom the

claim is asserted.  *Cf. Norton v. City of Marietta,* 432 F.3d 1145, 1150 (10th Cir. 2005) (holding it is the plaintiff's status at the time he filed the lawsuit that is determinative as to whether the § 1997e(a) exhaustion requirement applies); *Bias v. Cornell Corrections, Inc.*, 159 F. App'x 868, 870-71 (10th Cir. 2005) (holding the PLRA's requirement of exhaustion of administrative remedies applies to prisoners in privately-run prisons).  Accordingly, I find that Claims Two and Seven do not fall outside of the PLRA ambit with respect to Defendants Coffman and Quinn.[7]

In light of these findings, I respectfully recommend that the Motion, converted into one for summary judgment, be GRANTED as to the Second, Seventh, and Eighth Claims and that the court dismiss those claims without prejudice.  *See Fields v. Okla. State Penitentiary*, 511 F.3d 1109, 1113 (10th Cir. 2007) (noting dismissal of unexhausted claims on summary judgment should be without prejudice).

Having found that the Step 1 Grievance placed Defendants on adequate notice of the allegations that now give rise to the First, Third, Fourth, Fifth, and Sixth Claims, I consider Defendants' second argument that Plaintiff failed to complete the CDOC exhaustion process.  A prisoner is only required to exhaust those remedies that are "available" to him, *see* 42 U.S.C. § 1997e(a), but "an inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim under PLRA for failure to exhaust his administrative remedies." *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002).  Mr. Toevs attests that he filed both a Step 2 and Step 3 grievance, and states that "[b]ecause CDOC has not responded to any of my step two or three grievances for the past four years, I have no copies of those grievances."  [#33-

---

[7] Claim Eight does not implicate Defendants Coffman or Quinn. To the extent Plaintiff's Step 1 Grievance sufficiently placed the CDOC Defendants on notice as to Claims One, Three, Four, Five, and Six, it served to place Defendants Coffman and Quinn on notice as well.

1 at ¶ 19]. In Reply, Defendants offer no evidence to the contrary that Mr. Toevs would have access to copies of his grievances even if CDOC failed to respond. They argue instead that "Toevs was also required to file step two and three grievance even if CDOC did not respond to his step one grievance." [#40 at 1]. This is not responsive to Plaintiff's contention, as there is no dispute that CDOC responded to his Step 1 grievance; the issue, rather, is whether CDOC has been intentionally misfiling or losing Mr. Toevs's Step 2 and 3 grievances to prevent him from administratively exhausting his remedies.

Given the current asymmetry of information, I conclude that Plaintiff, at this stage, has carried his burden of demonstrating that a genuine issue of material fact exists as to whether he filed Step 2 and 3 Grievances following the CDOC's response to his Step 1 Grievance.[8] In so deciding, however, this court does not conclude that the issue must necessarily reach trial; rather, the exhaustion of administrative remedies may be subject to a further dispositive motion once some discovery has occurred. To hold otherwise might create a loophole in the requirement to exhaust administrative remedies, which result is neither intended by this court nor permitted by

---

[8] Plaintiff also argues that the CDOC's failure to timely respond to his Step 1 Grievance "abrogated his obligation to file any further grievances," but he cites to no case law, and his attorney was unable to cite to any authority during oral argument, to support this contention. [#33 at 5]. The Tenth Circuit has held that "when prison officials fail to timely respond to a grievance, the prisoner has exhausted 'available' administrative remedies under the PLRA." *Whitington v. Ortiz*, 472 F.3d 804, 807–08 (10th Cir. 2007) (citing *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002)). However, courts have since interpreted this holding to apply only when officials fail to respond to a grievance at the final stage of the grievance process, observing that failure to respond to a grievance at an intermediate level of the grievance process does not render further administrative remedies unavailable. *Hollis v. Davis*, No. 13–CV–0590–CVE–FHM, 2015 WL 1137551, at *7 (N.D. Okla. Mar. 12, 2015) (citing *Adams v. Fochee*, No. 12–cv–01076–PAB–CBS, 2013 WL 3093479, at *2 (D. Colo. June 18, 2013); *Rouse v. Baca*, No. CV 11–0433 MV/CG, 2012 WL 4498866, at *4–5 (D.N.M. Sept. 25, 2012)). And subsequent, unpublished Tenth Circuit opinions support this interpretation. *See Gomez v. Lopez*, 581 F. App'x 724, 725 (10th Cir. 2014); *Hemphill v. Jones*, 343 F. App'x 329, 331–32 (10th Cir. 2009).

Tenth Circuit law. *See Jernigan*, 304 F.3d at 1032-33. Thus, I respectfully recommend that the Motion, converted into one for summary judgment, be GRANTED IN PART, as to the Second, Seventh, and Eighth Claims, and DENIED IN PART, as to the First, Third, Fourth, Fifth, Sixth, and Ninth Claims.

## II.    Immunities

### A.    Eleventh Amendment

Of the remaining causes of action, the First, Third, Fourth, Fifth, and Sixth Claims include claims against Defendants in their official capacity. Defendants argue that those who are sued in their official capacity—Coffman, Jacobson, Raemisch, Will, Dent, and Burke—are entitled to Eleventh Amendment immunity.[9] [#28 at 16-17]. An official-capacity suit is, for all intents and purposes, to be treated as a suit against the entity, in this case the state. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). The Eleventh Amendment bars suits against a state by its own citizens, and generally immunizes state defendants sued in their official capacities from liability for damages and retroactive equitable relief. *See Johns v. Stewart*, 57 F.3d 1544, 1552 (10th Cir. 1995). Relying on the bar to suit, Defendants argue that "this Court lacks jurisdiction over any claims for damages against these State Defendants in their official capacities and these claims must be dismissed." [#28 at 17]. Their argument is inapposite, however, as Plaintiff seeks only

---

[9] I note that the relief sought as to Defendants Jacobson, Dent, Will, and Burke sued in their official capacity is duplicative of the relief sought as to Defendant Raemisch sued in his official capacity. Defendants Jacobson, Dent, Will, and Burke are CDOC employees and Defendant Raemisch is the CDOC executive director. *See* [#19 at ¶¶ 5, 7, 13, 14, 15]. Counsel for Plaintiff agreed during the Motion Hearing that the relief sought with respect to Dent, Will, and Burke sued in their official capacity may be obtained from Raemisch sued in his official capacity, and I see no reason why the same is not true for Jacobson. Accordingly, I respectfully recommend that the court dismiss Defendants Jacobson, Dent, Will, and Burke in their official capacity from this lawsuit.

prospective injunctive and declaratory relief with respect to Defendants sued in their official capacity.  *See* [#19 at ¶¶ 128, 136, 148, 153, 161, 167, 174, 179; #33 at 9; #48 at 3:15-20].

It is well-settled that an exception to the Eleventh Amendment's general bar is a suit in which a plaintiff seeks to prospectively enjoin a state official from violating federal law.  *Johns*, 57 F.3d at 1552 (citing *Ex parte Young*, 209 U.S. 123, 159-60 (1908)).  *See also Rounds v. Clements*, 495 F. App'x 938, (10th Cir. 2012) (noting "*Ex parte Young* permits suit against state employees for prospective relief whether the employee happens to be sued in his individual or official capacity") (citation omitted).  The *Ex parte Young* exception "enables federal courts to end continuing violations of federal law by state officials…so as to permit the federal courts to vindicate federal rights and hold state officials responsible to the supreme authority of the United States."  *Johns*, 57 F.3d at 1552 (citations and internal quotation marks omitted); *Harris v. Owens*, 264 F.3d 1282, 1289 (10th Cir. 2001) ("A suit within the *Ex parte Young* doctrine is not considered a suit against the state; rather, it is a suit against individual state officers who are stripped of their official character") (citation omitted).  To determine whether a suit falls within the *Ex parte Young* exception, the court "need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."  *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 645 (2002); *Muscogee (Creek) Nation v. Pruitt,* 669 F.3d 1159, 1167 (10th Cir. 2012). In doing so, the court takes care not to conflate this analysis with one under Rule 12(b)(6).  *See, e.g., Harris*, 264 F.3d at 1289 ("whether the suit states a claim upon which relief can be granted is neither logically antecedent to nor coincident in scope with the Eleventh Amendment inquiry").

As an initial matter, Defendants do not argue that Mr. Toevs fails to allege an ongoing violation of federal law. *See* [#28 at 16-17; #40]. Indeed, the issue was first raised by the court in a colloquy with counsel for Defendants when counsel contended that Plaintiff's official capacity claims were flawed because he had not pled a "policy or custom."[10] *See* [#48 at 40:20-42:25]. Although framed as an issue of subject matter jurisdiction, the United States Supreme Court has observed that courts need not raise the question of Eleventh Amendment immunity *sua sponte*. *Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 394 (1998) (Kennedy, J., concurring) (citing *Patsy v. Board of Regents of Fla.*, 457 U.S. 496, 515, n.19 (1982)); *U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 942 (10th Cir. 2008) (observing that "a court may raise the issue of Eleventh–Amendment immunity sua sponte but, unlike subject-matter jurisdiction, it is not obligated to do so") (citations omitted).

As to Plaintiff's allegations, counsel for Plaintiff characterized the ongoing violation during oral argument as "the absence of clear direction to Colorado Department of Corrections and attorney general, in policy or elsewhere, that tells them that they cannot read a prisoner's legal mail, thereby chilling Mr. Toevs' communications with counsel and it is that chilling effect which is ongoing every day that we seek to remedy with prospective relief in this case." [#48 a 49:20-50:1]. But the violation as described during oral argument is not pled in the Amended Complaint, and, rather, is directly contradicted by the allegations that are pled. For instance, Plaintiff alleges that CDOC AR 300-38 provides that "[t]he DOC shall ***ensure and facilitate offender access to counsel and assist offenders in making confidential contact with attorneys***

---

[10] The Tenth Circuit has rejected the argument that a plaintiff must prove that some "policy or custom" played a role in the alleged violation of federal law for Eleventh Amendment immunity to be waived under *Ex parte Young*. *See Rounds*, 495 F. App'x at 941.

*and their authorized representatives; such contact includes, but is not limited to uncensored*

*correspondence.* [4-4275]." [#19 at ¶ 29 (emphasis in original)]. Plaintiff further alleges that

"CDOC policy provides [Plaintiff's legal box] may only be 'searched in the presence of the

offender,' and even then, 'attorney-client privileged documents shall not be read, but only

searched for contraband." [*Id.* at ¶ 30]. He also alleges that "CDOC ARs specifically prohibit

CDOC staff from reading documents in legal boxes," [*id.* at ¶ 38]; Defendants have persisted in

their continued refusal to comply with CDOC AR 300-36, [*id.* at ¶ 143]; and CDOC

"implement[ed] administrative regulations that prohibit prison staff from reading mail to

prisoners from lawyers, and "permitt[ed] prisoners to keep such mail in legal boxes specifically

used to contain and identify confidential legal material." [*Id.* at ¶¶ 163, 164].

Nevertheless, Plaintiff alleges no one has returned him to an incentive unit and "no one

has given him back the *CPLP v. Herrera* documents CDOC took from him." [*Id.* at ¶¶ 101,

102]. He further alleges that he "lost his eligibility to petition the governor for commutation of

his sentence for two years, rendering the previous twelve years of [his] display of good behavior

irrelevant for purposes of his clemency bid," and that "no one has done anything to remedy any

other wrong that [he] suffered as a consequence of his wrongful conviction of Unauthorized

Possession in early 2014." [*Id.* at ¶ 103]. Based on these allegations and Defendants' failure to

raise and substantively brief the issue, this court finds upon a straightforward inquiry into the

Amended Complaint that the pleading alleges an ongoing violation of federal law, and Mr. Toevs

seeks relief properly characterized as prospective. *See Rounds*, 495 F. App'x 940. Accordingly,

this court respectfully declines at this juncture to recommend dismissal of Plaintiff's official capacity claims on Eleventh Amendment immunity grounds.[11]

## B.    Absolute Immunity

Defendants Coffman and Quinn also argue that they are entitled to absolute or quasi-judicial immunity.  [#28 at 14-15].  Plaintiff responds that absolute immunity is not applicable to either Defendant Quinn, because the allegations directed at him do not involve his participation in a judicial proceeding, or to Defendant Coffman, because she is sued only in her official capacity.  [#33 at 7-8].

### 1.    *Applicable Law*

Absolute prosecutorial immunity is a complete bar to a suit for damages under 42 U.S.C. § 1983.  *Imbler v. Pachtman,* 424 U.S. 409, 419 n.13 (1976).  However, absolute immunity "extends only so far as is necessary to protect the judicial process." *Thomas v. Kaven*, 765 F.3d 1183, 1193 (10th Cir. 2014) (citing *Burns v. Reed,* 500 U.S. 478, 486–87 (1991)).  "The rationale for according absolute immunity in the civil rights context is to incorporate traditional common law immunities and to allow functionaries in the judicial system the latitude to perform their tasks absent the threat of retaliatory § 1983 litigation."  *Snell v. Tunnell*, 920 F.2d 673, 686-87 (10th Cir. 1990).  Whether absolute immunity is available is generally a question of law, and the party asserting the defense has the burden of demonstrating its applicability.  *See Burns*, 500 U.S. at 486 ("the official seeking absolute immunity bears the burden of showing that such

---

[11] This court does not pass on whether Plaintiff's claims that seek prospective injunctive relief are cognizable, or the appropriateness of the relief requested.  The court further notes that the Tenth Circuit has held that Eleventh Amendment immunity may be raised at any time, even on appeal, *U.S. ex rel. Burlbaw*, 548 F.3d at 942, and that further argument with respect to Eleventh Amendment immunity may be appropriate if properly raised by Defendants at a later time.  *Id.*

immunity is justified for the function in question") (citations omitted). *See also Forrester v. White*, 484 U.S. 219, 224 (1988) (Officials who "seek exemption from personal liability" on the basis of absolute immunity bear "the burden of showing that such an exemption is justified by overriding considerations of public policy"); *Buckley v. Board of County Com'rs of County of El Paso*, No. Civ. 04CV02465LTBPAC, 2005 WL 2359475, at *6 (D. Colo. Sept. 19, 2005).

The defense of absolute immunity from civil rights suits is well-established in several contexts. For instance, "[a] prosecutor is absolutely immune for activities which are intimately associated with the judicial process, such as initiating and pursuing a criminal prosecution." *Snell*, 920 F.2d at 686 (quoting *Imbler*, 424 U.S. at 430). Prosecutorial immunity applies equally to "state attorneys and agency officials who perform functions analogous to those of a prosecutor in initiating and pursuing civil and administrative enforcement proceedings." *Buckley v. Board of County Com'rs of County of El Paso*, 2005 WL 2359475, at *6 (quoting *Pfeiffer v. Hartford Fire Ins. Co.*, 929 F.2d 1484, 1489 (10th Cir. 1991) (holding that prosecutors are "absolutely immune from liability for allegedly failing to conduct an adequate, independent investigation of matters referred to them for prosecution.") (quotation omitted)). *See also Robins v. Volkswagenwerk AG*, 940 F.2d 1369, 1372 (10th Cir. 1991).

However, the same limitations that apply to granting absolute immunity to prosecutors also apply to other government officials, and, traditionally, immunity "does not extend to a prosecutor's actions which may be classified as administrative or investigative." *Imbler*, 424 U.S. at 430–31; *Harlow v. Fitzgerald*, 457 U.S. 800, 811 n.16 (1982)).[12] The Supreme Court has

---

[12] *See also Thomas*, 765 F.3d at 1191 ("the Supreme Court has made clear that absolute immunity is not available for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate") (quoting *Imbler*,

been "quite sparing" in recognizing absolute immunity, and generally evaluates entitlement to absolute immunity according to the local official's function, rather than his or her identity. *Buckley*, 509 U.S. at 269.  *See also Dillard v. Gregory*, No. 11–cv–01928–RBJ–BNB, 2012 WL 5056932, at *5 (D. Colo. Oct. 18, 2012) ("Absolute immunity 'is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches'") (quoting *Forrester v. White,* 484 U.S. 219, 227 (1988) (emphasis in original)).

### 2.  *Defendant Quinn*

In light of the foregoing law, this court assesses the actual function Defendant Quinn served while engaging in the acts as alleged.  *See, e.g., Mink v. Suthers*, 482 F.3d 1244, 1261-62 (10th Cir. 2007).  Plaintiff alleges that Defendant Quinn read the Owen Letters, confiscated four documents found therein, i.e., the exhibits to the *CPLP v. Herrerra* complaint, and instructed Defendants Nordell, Reynolds, Foster, Ortiz, Barr, and Dent that Plaintiff had no "compelling interest" in these documents and could not keep them in his possession.  [#19 at ¶¶ 54, 55]. Defendant Dent subsequently informed Ms. Owen that Plaintiff was under investigation for "possession of other offenders' legal work," and Defendant Foster told Ms. Owen that Defendant

---

424 U.S. at 430-31) (internal quotations omitted).  "The more distant a function is from the judicial process, the less likely absolute immunity will attach."  *Snell*, 920 F.2d at 687 (citing *Malley v. Briggs*, 475 U.S. 335, 340–41 (1986) (reaffirming that an officer applying for a warrant is not absolutely immune from suit, just as a complaining witness would not be entitled to such immunity, and reasoning that "applying for a warrant 'while a vital part of the administration of criminal justice, is further removed from the judicial phase of criminal proceedings than the act of a prosecutor in seeking an indictment.'").  *See also Scott v. Hern*, 216 F.3d 897, 908 (10th Cir. 2000).  For instance, prosecutors are not entitled to absolute immunity for advice they have provided police or when they gather evidence prior to the initiation of an indictment.  *See, e.g., Buckley v. Fitzsimmons,* 509 U.S. 259, 274-75 (1993).  In assessing which acts are entitled to absolute immunity, the "determinative factor is advocacy because that is the prosecutor's main function and the one most akin to his quasi-judicial role."  *Snell*, 920 F.2d at 693 (citation and internal quotation omitted).

Quinn was overseeing the investigation.   [*Id.* at ¶ 60]. When Ms. Owen emailed Defendants

Foster, Ortiz, and Quinn to complain that their actions were in violation of federal law,

Defendant Foster responded that "the Attorney General's Office is fully aware of all aspects of

our investigation. Mr. Toeves [sic] will remain on removal from population status and we will

follow the AGs direction pertaining to his legal material."   [*Id.* at ¶¶ 61, 62].   Ms. Owen then

emailed Defendant Quinn on January 15, 2014, demanding the return of Plaintiff's legal material

and asking that Quinn direct his clients to drop the "Unauthorized Possession" charge she

mistakenly believed they had brought against Plaintiff.   [*Id.* at ¶¶ 65, 66].   Five hours later that

same day CDOC served Plaintiff with the Unauthorized Possession charge.   As of the date of the

Amended Complaint, Defendant Quinn had not responded to Ms. Owen's email.   [*Id.* at ¶¶ 68,

69].

In sum, the allegations regarding Defendant Quinn do not implicate him in a judicial

process, such as defending a civil action against Plaintiff.   Rather, they indicate that he acted in

an investigatory and advisory manner.   The allegations of specific conduct attributable to

Defendant Quinn are confined to his confiscating, reading, and withholding Plaintiff's legal

materials and his involvement in the decision to charge Plaintiff with Unauthorized Possession.

Indeed, as Plaintiff argues, the allegations indicate that Defendant Quinn acted more akin to the

function of a CDOC official than an agency attorney.   He allegedly assisted many of the CDOC

Defendants in their investigation of Plaintiff and purportedly gave advice as to whether Plaintiff

had violated CDOC administrative regulations.   *Cf. Rex v. Teeples*, 753 F.2d 840, 844 (10th

Cir.), cert. denied, 474 U.S. 967 (1985) ("a prosecutor who interrogates a suspect in the first

instance is fulfilling an investigative, rather than a prosecutorial, function.").   By contrast,

Plaintiff does not allege that Defendant Quinn took action in conjunction with the presentation of evidence in a court adjudication.  *Cf. Butz v. Economou,* 438 U.S. 512, 517 (1978) ("an agency attorney who arranges for the presentation of evidence on the record in the course of an adjudication is absolutely immune from suits based on the introduction of such evidence."). Thus, the case Defendants rely on in their Motion, *Cessar v. CO Dept. of Corrections*, in which a *pro se* prisoner moved to amend his pleading to add the defending attorney general as a defendant, is inapposite.  Civil No. 08–cv–00283–REB–KLM, 2009 WL 982151, at *5 (D. Colo. Apr. 13, 2009) ("Plaintiff seeks to add ten more named defendants, including the attorney for the government in this case…Defendants' counsel clearly is entitled to absolute immunity from plaintiff's purported civil conspiracy claim against him for his conduct in this case.").  As is *Van Deelen v. City of Kan. City*, in which Judge Vratil framed the question before her as "whether the doctrine of absolute prosecutorial or 'quasi-judicial' immunity protects city attorneys from Section 1983 damages claims which arise from their defense of a municipality and municipal employees in a state civil action."  No. Civ.A. 05–2028, 2005 WL 3050151, at *26 (D. Kan. Nov. 14, 2005).  In reviewing the Amended Complaint, the allegations against Quinn do not arise from his defense of CDOC in a state civil action.[13]

---

[13] *Cf. also Barrett v. United States,* 798 F.2d 565, 569-70, 573 (2d Cir. 1986) (determining that assistant attorney general defending a wrongful death action was entitled to absolute immunity from claims that he concealed facts concerning federal involvement in the death, and finding by contrast that the federal attorneys, who did not represent the State and attempted to minimize the exposure of the federal government through concealment, were not entitled to absolute immunity because their activities were too far removed from the judicial process) (cited with approval by *Robinson*, 940 F.2d at 1372-73 n.4); *Murphy v. Morris,* 849 F.2d 1101, 1105 (8th Cir. 1988) (holding an assistant attorney general defending a prisoner civil rights action was entitled to absolute immunity on claims that he introduced improperly obtained impeachment evidence at trial, but concluding absolute immunity did not attach to the act of obtaining the evidence from

A case closer to the point is *Buckley v. Board of County Com'rs of County of El Paso*, in which Judge Babcock found upon consideration of a Rule 12(b)(6) motion that defendants had not demonstrated entitlement to absolute immunity, noting that plaintiffs had alleged "not only that defendants initiated an action against them that is without foundation, but that [defendants] initiated this action deliberately based on false information and outside of the normal administrative process."  2005 WL 2359475, at *7 ("I cannot say that plaintiffs can prove no set of facts that would show [defendants] acted outside of their appropriate roles, or that their actions were investigative rather than quasi-judicial.").  I similarly find that Defendant Quinn has not carried his burden at this juncture.[14]

Finally, considering the rationale behind absolute immunity—to protect the judicial process from interference—Defendant Quinn has not demonstrated that extending the exception in this context is appropriate or justified.  For instance, qualified immunity adequately serves to protect government officials in the exercise of their duties.  *See Thomas*, 765 F.3d at 1193 (finding defendants' request for absolute immunity "an unwarranted expansion" of that protection, and observing that "qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties.").  *Cf. Burns*, 500 U.S. at 495 ("Indeed, it is incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice.").  Additionally, while Defendant Quinn does not argue that the January 17, 2014 disciplinary

---

the prison mail system, an investigative activity) (cited with approval by *Robinson*, 940 F.2d at 1372-73 n.4).

[14] Indeed, in the Motion to Dismiss and at oral argument, Defendants conceded that the AG Defendants not only represent the CDOC in litigation but also advise the CDOC during the investigative phase on matters that have not yet culminated in legal action.  *See, e.g.,* [#28 at 17; #19 at ¶ 62].

hearing was a judicial process, even if he did, Defendant Will prosecuted the case and Defendant Burke adjudicated the matter.   [#19 at ¶ 73].   Simply put, no allegation implicates Defendant Quinn's participation in a judicial proceeding such that, by declining to extend absolute immunity, the court risks subjecting the judicial process to interference, harassment, or intimidation.   *See Burns*, 500 U.S. at 494-95 ("the concern with litigation in our immunity cases is not merely a generalized concern with interference with an official's duties, but rather is a concern with interference with the conduct closely related to the judicial process.") (citations omitted).

### 3. *Defendant Coffman*

The absolute immunity assessment for Defendant Coffman is more straightforward.   As discussed above, she is sued in her official capacity only and an official-capacity suit is treated as a suit against the entity.   *Hafer*, 502 U.S. at 25.   Unlike various government officials sued in their individual capacity, local governing bodies are not entitled to the traditional common law immunities for § 1983 claims, and thus government officials sued in their official capacity are not entitled to absolute immunity from suit under § 1983.   *Moss v. Kopp*, 559 F.3d 1155, 1168 (10th Cir. 2009) (citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 165–66 (1993)).

Accordingly, I find that neither Defendant Quinn nor Defendant Coffman is entitled to absolute immunity based on the allegations asserted in the Amended Complaint.

### C.      Colorado Governmental Immunity Act

Plaintiff's Claim Nine asserts liability for malicious prosecution against Defendants Trani, Soares, Raemisch, Quinn, Dent, and Foster, on the basis that they "contributed to bringing and upholding the COPD charge of Unauthorized Possession" against him.   [#19 at ¶ 180]. Defendants argue they are entitled to immunity against this claim under the Colorado Governmental Immunity Act ("CGIA"), which bars actions in tort against public employees and entities, subject to certain provisions waiving immunity.  *Medina v. State,* 35 P.3d 443, 453 (Colo. 2001).   Plaintiff contends in response that immunity does not apply because he has alleged these Defendants acted in a willful and wanton manner.  [#33 at 21-22].  Plaintiff pleads he has complied with Colo. Rev. Stat. § 24-10-109.

The CGIA provides:

[a] public employee shall be immune from liability in any claim for injury ... which lies in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by a claimant and which arises out of an act or omission of such employee occurring during the performance of his duties and within the scope of his employment unless the act or omission causing injury was willful and wanton...

C.R.S.A. § 24-10-118(2)(a).  The CGIA covers "all the circumstances under which the state, any of its political subdivisions, or the public employees of such public entities may be liable in actions which lie in tort."  Colo. Rev. Stat. § 24-10-102.  The term "public entity" is defined as "the state, county, city and county, municipality, school district…and every other kind of district, agency, instrumentality, or political subdivision thereof organized pursuant to law." *Id.* at § 103(5).  "Public employee" is defined as "an officer, employee, servant, or authorized volunteer of the public entity." *Id.* at § 103(4).  "Governmental immunity raises a jurisdictional issue." *Springer v. City & County of Denver,* 13 P.3d 794, 798 (Colo. 2000).

It is undisputed that this claim arises in tort and under state law, *see Graham v. State*, 956 P.2d 556, 560 (Colo. 1998) (conspiracy and malicious prosecution claims would lie in tort and would therefore be barred by the CGIA), and that the allegations concern Defendants' conduct within the scope of their employment.  Thus, the CGIA confers immunity to Defendants, unless their conduct was willful and wanton.  *See Middleton v. Hartman*, 45 P.3d 721, 728 (Colo. 2002) ("the state is not liable for its employees' willful and wanton conduct"); *Gray v. University of Colorado Hosp. Authority*, 284 P.3d 191, 197 (Colo. App. 2012) ("the sovereign immunity of public entities is not waived if their employees' acts or omissions are willful and wanton.").  The Colorado Supreme Court has recently held that the willful and wanton inquiry under the CGIA is inextricably tied to the question of whether the court has subject matter jurisdiction.  *Martinez v. Estate of Bleck*, 379 P.3d 315, 322 (Colo. 2016).  In particular, the trial court should not proceed with a tort claim until it satisfies itself that defendants acted willfully and wantonly, thereby confirming that those defendants are not entitled to sovereign immunity.  *Id.* (holding that "the trial court erred when it failed to determine whether [defendant's] conduct was willful and wanton. Instead, it determined that [plaintiff] had sufficiently pled that [defendant] acted in a willful and wanton manner, and that the ultimate determination of whether he in fact acted willfully and wantonly had to be left to trial.").  On the record before it, this court cannot conclude that Defendants Quinn and Dent acted in a willful and wanton manner.  Therefore, I respectfully recommend that Plaintiff's malicious prosecution claim be dismissed without prejudice on the basis of immunity.[15]

---

[15] In so finding, this court makes two observations.  First, in reviewing the Amended Complaint, this court notes that Plaintiff fails to plead a cognizable malicious prosecution claim as to Trani, Soares, Raemisch, and Foster due to insufficient allegations regarding their personal

### III.   Specific Claims

This court now turns to Defendants' contention that Plaintiff fails to plead a cognizable claim with respect to what remains, i.e., the First, Third, Fourth, Fifth and Sixth Claims.  Plaintiff asserts all of these claims pursuant to 42 U.S.C. § 1983, which requires him to show (1) that he had a right secured by the Constitution and laws of the United States that was violated (2) by a person who acted under color of state law.  *Hall v. Witteman,* 584 F.3d 859, 864 (10th Cir. 2009).  An individual cannot be held liable under § 1983 unless he or she personally participated in the deprivation.  *Olsen v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993) (citation omitted).  Additionally, the complaint must allege an affirmative link between the alleged constitutional violation and the specific individual's participation.  *Stidham v. Peace Officer Standards and Training,* 265 F.3d 1144, 1156-57 (10th Cir. 2001).

### A.   Qualified Immunity

At the end of the Motion to Dismiss, Defendants assert general entitlement to qualified immunity; however, they do not specify which Defendant is entitled to the defense or as to which claim.  *See* [#28 at 42-43 ("Assuming *arguendo* that Toevs demonstrated a violation of his constitutional rights, Defendants are nevertheless entitled to qualified immunity because their action did not violate clearly established law.")].  In his Response, Plaintiff correctly notes that no Defendant sued in his or her official capacity may assert qualified immunity, and that for those sued in their individual capacity, asserting qualified immunity "with nothing more should

---

participation in prosecuting Mr. Toevs and/or with respect to the malice component.  Second, this court notes that, to the extent discovery yields sufficient evidence to establish willful and wanton conduct as to Quinn and/or Dent, Plaintiff may seek leave to amend his operative pleading to assert additional allegations to support this claim.

not be considered sufficient to shift the burden to [Plaintiff]."  [#33 at 23].  Defendants do not

address qualified immunity in their Reply.  *See generally* [#40].

The doctrine of qualified immunity "shields government officials performing discretionary functions from individual liability under 42 U.S.C. § 1983 unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known."  *DeSpain v. Uphoff*, 264 F.3d 965, 971 (10th Cir. 2001) (quoting *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1255 (10th Cir. 1998) (internal quotation marks omitted).  Qualified immunity is an affirmative defense to § 1983 liability (*see Adkins v. Rodriguez*, 59 F.3d 1034, 1036 (10th Cir. 1995)); once a defendant asserts the defense, the plaintiff must demonstrate that qualified immunity is not proper by showing that "(1) the defendant's conduct violated a constitutional right and (2) the law governing the conduct was clearly established at the time of the alleged violation."  *DeSpain*, 264 F.3d at 971 (quoting *Baptiste*, 147 F.3d at 1255).

The general assertion of qualified immunity by Defendants, with no specificity as to the two prongs listed above or recognition that the defense operates to shield only those alleged to have acted in their individual capacity, is insufficient to shift the burden to Plaintiff to demonstrate in response to a Rule 12(b)(6) motion that the immunity does not apply.  Defendants may raise the defense in a motion for summary judgment, if appropriate.

I now turn to the following two issues:  (1) whether Plaintiff has sufficiently pled a cognizable claim generally, and (2) which Defendants should be dismissed from such claims for

lack of personal participation or otherwise.[16]  I take these considerations out of order from how the Parties argued them, because personal participation is irrelevant absent a cognizable claim.

### 1.   *First Claim for Retaliation*

Defendants argue that Plaintiff fails to state a claim for retaliation because he was not prevented while in segregation from filing his opening brief in the Tenth Circuit appeal, he ultimately did not use the *CPLP v. Herrera* complaint and associated exhibits in either his opening or reply briefs in the Tenth Circuit appeal, and he has no constitutional right in the possession of the *CPLP v. Herrera* complaint and associated exhibits because they are contraband.  [#28 at 24-25].  Plaintiff disagrees that his pleading contains any deficiency.  [#33 at 9-10].

"Prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his [constitutional rights.]"  *Smith v. Maschner,* 899 F.2d 940, 947 (10th Cir.

---

[16] Plaintiff alleges that the CDOC and the AG's Office have engaged in a pattern of conduct to moot prisoners' claims and thereby impede their access to the courts.  See [#19 at ¶¶ 109-120].  By way of example, Plaintiff refers to the AG Office's defense of his disciplinary conviction, defense of Defendant Quinn's involvement in the charge that led to the conviction, and other civil actions in which non-party assistant attorney generals defended CDOC officials.  *See* [#19 at ¶¶ 110-114].  There is currently no cause of action for conspiracy before this court; and, to the extent Plaintiff would rely on these allegations to implicate any Defendant for whom he does not otherwise assert allegations of personal participation, this court finds that such a theory of liability is simply not available.  *See Kirby v. Dallas County Adult Probation Department*, 359 F. App'x 27, 34 (10th Cir. 2009) (quoting *Hunt v. Bennett*, 17 F.3d 1263, 1266 (10th Cir. 1994) (to state a valid conspiracy claim, "a plaintiff is required to 'allege specific facts showing agreement and concerted action'").  *But see Millhouse v. Carlson*, 652 F.2d 371, 372 (3d Cir. 1981) (reversing district court decision and holding *pro se* prisoner stated a claim for relief on theory that prison officials had subjected him to conspiratorially planned series of disciplinary actions as retaliation for initiating a civil rights suit against prison officials).  Plaintiff has not alleged specific facts of agreement between any individuals within the CDOC and the AG's Office.  Thus, in addressing the sufficiency of Plaintiff's pleading, I examine the actions of each Defendant (sued in his or her individual capacity) as alleged so as to determine whether personal participation is present.

1990). "Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." *Poole v. Cnty. of Otero,* 271 F.3d 955, 960 (10th Cir. 2001) (quoting *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir. 2001)). *See also Wolford v. Lasater,* 78 F.3d 484, 488 (10th Cir. 1996) ("[G]overnment action which chills constitutionally protected speech or expression contravenes the First Amendment."). To state a claim for retaliation, a plaintiff must allege the following: (1) he was engaged in constitutionally protected activity; (2) the defendant's actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct. *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1203 (10th Cir. 2007) (citing *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000)). This standard requires a plaintiff to provide circumstantial evidence of a "chronology of events" supporting an inference of retaliation. *Maschner,* 899 F.2d at 949. Retaliatory acts under § 1983 include acts that would otherwise be permissible if they were not conducted in retaliation. *Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 847 (10th Cir. 2005) (citing *DeLoach v. Bevers,* 922 F.2d 618, 620 (10th Cir. 1990))

*Constitutionally Protected Activity*. Plaintiff alleges that he was involved in litigation, i.e., *Toevs v. Milyard*, engaging the services and advice of Ms. Owen, and obtaining legal materials for use in his legal proceedings. [#19 at ¶¶ 18-32, 40; #33 at 9]. Prisoners have a constitutional right of access to the courts, *Green v. Johnson*, 977 F.2d 1383, 1389 (10th Cir. 1992), and thus a prisoner who files a lawsuit against prison officials has engaged in constitutionally-protected activity. *Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir.

2010); *Smith*, 899 F.2d at 947.   A prisoner also has a constitutionally protected right to correspond with his attorney "concerning either the legality of his conviction or the conditions of his incarceration." *LeVier v. Woodson*, 443 F.2d 360, 361 (10th Cir. 1971).  *See also Vreeland v. Raemisch*, No. 12–cv–01921–PAB–KMT, 2013 WL 5462299, at *6 (D. Colo. Sept. 30, 2013).[17] And, "prison officials may not affirmatively hinder a prisoner's efforts to construct a nonfrivolous appeal or claim."  *Green*, 977 F.2d at 1389-90 ("Any deliberate impediment to access [to the courts], even a delay of access, may constitute a constitutional deprivation…[t]herefore, if true, plaintiff's allegations concerning the improper destruction of his legal materials and his denial of access to the law library would form the basis for a cognizable claim for a violation of plaintiff's [constitutional rights]") (citation omitted).  I find Plaintiff has satisfied the first element of the claim.

*Adverse Action.*   Next, Plaintiff alleges he suffered adverse action as a result of the protected activity, including his placement in segregation, the seizure of his legal documents, removal from the incentive pod, and, ultimately, disqualification from clemency eligibility.  [#19 at ¶ 126; #33 at 9-10].  This suffices to establish the second element of the claim.  *See Maschner*, 899 F.2d at 947-48 (citing *Harris v. Fleming,* 839 F.2d 1232, 1236–38 (7th Cir. 1988) for the proposition that "allegations of retaliation, combined with evidence of termination from prison employment and cell transfers following successful lawsuits," is sufficient to create jury question).

---

[17] At a minimum, the Owen Letters, which were read and confiscated, included correspondence between Plaintiff and his attorney regarding conditions of his confinement, specifically the arbitrary implementation of STG designations, which Plaintiff alleged in *Toevs v. Milyard*, and which the *CPLP v. Herrera* complaint alleged, were used by prisoner officers to silence prisoner speech. *See, e.g.,* [#19 at ¶¶ 19, 22, 24-25].

***Substantial Motivation in Response.*** Finally, the timeline of events supports an inference of retaliation as to certain Defendants. The *CPLP v. Herrera* complaint targeted STG classifications of some of Ms. Owen's clients, and alleged that Intel, including Defendants Barr and Dent, "were refusing to provide intel files…in violation of the Colorado Criminal Justice Records Act." [#19 at ¶ 25]. At approximately the same time as Ms. Owen filed *CPLP v. Herrera*, Plaintiff initiated the *Milyard* litigation, alleging in part that prison officers were retaliating against prisoners who spoke out against the policies and practices of a CDOC facility, Sterling Correctional facility, where Plaintiff was confined prior to CSP. [#19 at ¶¶ 21, 22, 24, 25]. Ms. Owen mailed a copy of the *CPLP v. Herrera* complaint to Plaintiff in June 2013, and Plaintiff alleges he anticipated using the *CPLP v. Herrera* complaint (and the allegations contained therein) in his efforts in *Milyard*. [#19 at ¶¶ 28, 51, 125]. Plaintiff appealed *Milyard* to the Tenth Circuit in November 2013. [*Id.* at ¶ 23]. On December 30, 2013, CSP officers removed Plaintiff from general population and took him to a strip cell, where he watched Defendants Dent and Barr search and confiscate the contents of his legal box. [*Id.* at ¶ 34]. Among the items read and removed were letters between Plaintiff and attorneys from the Civil Rights Clinic at the University of Denver, the American Civil Liberties Union, and the Colorado Prison Law Project, Plaintiff's unfinished appellate brief, and the *CPLP v. Herrera* complaint. [*Id.* at ¶¶ 40, 41, 43]. On January 15, 2014, Defendant Will served Plaintiff with a written charge for Unauthorized Possession. [*Id.* at ¶ 68]. The notice advising Plaintiff of the charge identified Dent as the initiating CDOC employee and Will as the reviewing supervisor. [*Id.* at ¶ 71]. Defendant Will prosecuted the Unauthorized Possession charge during a CDOC hearing held January 17, 2014. [*Id.* at ¶ 73]. *Cf. Baldauf v. Hyatt,* No. 01–cv–01315–REB–CBS, 2008

WL 280839 at *10 (D. Colo. 2008) (entering summary judgment for defendant on retaliation claim where evidence showed that defendant was "merely the reviewing supervisor" who neither reviewed nor filed the COPD charge against plaintiff). Plaintiff then remained under punitive segregation conditions until January 23, 2014. [*Id.* at ¶ 57].

While temporal proximity alone is insufficient to establish a prima facie case of retaliation, *Strope v. Cummings*, 381 F. App'x 878, 883 (10th Cir. 2010), I find that Plaintiff has alleged specific facts of retaliation, which when coupled with the temporal proximity of events, are sufficient to overcome the Rule 12(b)(6) challenge as to Defendants Dent, Barr, and Will. In other words, Plaintiff pleads facts that, if proven, "support an inference by a fair-minded jury that defendants took [adverse] action against [him] based at least in part on improper motives." *Maschner*, 899 F.2d at 948-49 ("Smith's appearance in court, a protected activity, and the prison's disciplinary action, taken immediately upon his return from court, were indisputably in close temporal proximity"). *See also McDonald v. Hal*, 610 F.2d 16, 18 (1st Cir. 1979) (finding circumstantial evidence of retaliation sufficient to withstand motion to dismiss: "[plaintiff] in his complaint did aver a chronology of events which may be read as providing some support for an inference of retaliation") (cited with approval by *Maschner*, 899 F.2d at 949); *Quintana v. Edmond*, No. 06–cv–01187–WDM–KLM, 2008 WL 3539265, at *3 (D. Colo. 2008) ("I conclude that the instruction from the Tenth Circuit [in *Maschner*] is that where an inmate presents evidence that could establish that the adverse action was motivated at least *in part* by an improper motive, this is sufficient to create an issue of fact as to whether retaliatory animus was

the 'but for' cause of the decision") (emphasis in original).[18]   Mr. Toevs alleges that Barr and

Dent were defendants in *CLCP v. Herrera* [#19 at ¶ 25]; a subset of the materials that Dent and

Barr seized and read were legal communications between Ms. Owen and Mr. Toevs, [*id.* at 43];

Dent monitored all of Mr. Toevs' calls since September 2013 [*id.* at ¶ 63]; and, within five hours

of Ms. Owen's premature demand that a charge of Unauthorized Possession be dropped,

Defendant Will served Plaintiff with a write-up for Unauthorized Possession.  [*Id.* at ¶¶ 66-68].

Drawing all inferences in favor of Plaintiff, I concluded that these allegations are sufficient to

state a claim for a pattern of retaliatory conduct by members of Intel against Mr. Toevs for

speaking out against the policies and practices of SCF.

However, I find that Plaintiff has not alleged adverse actions or sufficient facts to infer a

retaliatory motive on the part of the remaining Defendants, i.e., Foster, Ortiz, Burke, Quinn,

Nordell, and Reynolds.   According to the Amended Complaint, Defendants Foster, Ortiz,

---

[18] With respect to Defendants' specific arguments, I find they view Plaintiff's allegations too
narrowly.  First, contrary to Defendants' characterization, possession of the *CPLP v. Herrera*
complaint and associated exhibits is not the protected interest Plaintiff asserts.  *See* [#28 at 23].
As this court reads the Amended Complaint, Plaintiff asserts a protected interest in pursuing the
*Milyard* appeal, generally researching and preparing lawsuits, and communicating with his
attorney about ongoing and future lawsuits.  Indeed, Defendants' description of the *CPLP v.
Herrera* complaint and exhibits thereto as "contraband" and contention that Plaintiff had no
constitutional interest in possessing them serves as a wobbly argument considering the Court of
Appeals specifically held that the materials either were not contraband, or CDOC had failed to
explain why they were contraband.  *See* [#28 at 25; #19 at ¶ 98].  Next, Defendants' confiscation
of the *CPLP v. Herrera* complaint and exhibits is but one example of the adverse action that
Plaintiff alleges.  He also alleges that, as a result of his protected activity, Defendants removed
him from general population and placed him in segregation, seized his legal correspondence and
other materials in addition to the *CPLP v. Herrera* pleadings, [*see* #19 at ¶¶ 43-45, 50-51], and
removed him from the incentive pod.  Ultimately, he was disqualified from seeking clemency for
two years, and to date no one has returned him to the incentive unit.  [*Id.* at ¶¶ 88, 101].
Defendants simply place too much emphasis on the *CPLP v. Herrara* materials.  Finally, to the
extent Defendants suggest Plaintiff fails to satisfy the third element of the claim because a
"logical, non-retaliatory reason for CDOC's acts exist," this is an argument better suited for
summary judgment, when the court may consider testimony or other evidence supporting such.

Nordell, and Reynolds simply read the legal materials that Barr and Dent confiscated. *See* [#19 at ¶¶ 52, 53, 54]. It is not immediately clear to this court that such action constitutes adverse action. But even if it did, there are no allegations that these Defendants were motivated to read the confiscated materials as a result of Plaintiff's litigation activities or correspondence with Ms. Owen. Indeed, Defendant Foster told Ms. Owen that Defendant Quinn was overseeing the investigation of Plaintiff, and that he and his staff were "awaiting instructions from Quinn about what to do next." [*Id.* at ¶ 60]. The allegations demonstrate that Defendants Foster, Ortiz, Nordell, and Reynolds intended only to follow Quinn's legal advice. Defendant Burke merely presided over the disciplinary hearing, [*id.* at ¶¶ 73, 75, 80]; and, while a disciplinary conviction likely constitutes adverse action, Plaintiff alleges that Burke relied on Defendant Quinn's advice in rendering his judgment, as opposed to suggesting that Burke acted from some retaliatory animus. *See* [*id.* at ¶ 82]. Finally, whereas the *CPLP v. Herrera* complaint actually named Defendants Barr and Dent, Plaintiff does not allege that any of the other Defendants were named or mentioned in *CPLP v. Herrera* or *Toevs v. Milyard*, or knew of the allegations asserted in either lawsuit. *Frazier v. Dubois*, 922 F.2d 560 562, n.1 (10th Cir. 1990) ("Mere allegations of constitutional retaliation will not suffice; plaintiffs must rather allege specific facts showing retaliation *because of* the exercise of the prisoner's constitutional rights.") (emphasis in original). *See also Perrian v. Coons*, No. 13–cv–02951–KLM, 2015 WL 1539022, at *17-18 (D. Colo. Mar. 31, 2015) (finding plaintiff's retaliation claim failed at the third element for several defendants due to plaintiff's failure to allege defendants acted with retaliatory motive). With respect to Defendant Quinn, Plaintiff alleges that Quinn read the Owen Letters and confiscated four documents found therein, which were the exhibits to the *CPLP v. Herrera* complaint, and

instructed Defendants Nordell, Reynolds, Foster, Ortiz, Barr, and Dent that Plaintiff did not have a compelling interest in possessing those documents and that he could not have them.  [#19 at ¶ 55].  Plaintiff does not allege that Defendant Quinn ordered, or even advised, Defendant Will to charge him with Unauthorized Possession.[19]  Nor does Plaintiff allege that Quinn, or the AG's Office in general, is implicated in the *CPLP v. Herrera* complaint or *Toevs v. Milyard* lawsuit.

Accordingly, I recommend that this claim be dismissed as to all Defendants sued in their individual capacity other than Defendants Barr, Dent, and Will.

2.    *Third Claim for Deprivation of Property*

Plaintiff asserts a claim for deprivation of property without due process in violation of the Fourteenth Amendment, based on Defendants' confiscation and retention of the exhibits attached to the *CPLP v. Herrera* complaint, which he received as correspondence from Ms. Owen and where were incorporated in the Owen Letters.  [#19 at 28].  Defendants argue that Plaintiff fails to state a claim for violation of his Due Process rights because "he was provided meaningful post-deprivation due process."  [#28 at 29].  Plaintiff responds that he was entitled to a pre-deprivation hearing if Defendants confiscated his legal materials pursuant to CDOC policy, but concedes that "an adequate postdeprivation remedy" was sufficient if Defendants agree that their conduct constitutes a "random and unauthorized act."  [#33 at 14].  And, Plaintiff argues, to the extent a post-deprivation hearing is all the process to which he is entitled, "Defendants have not satisfied their burden of showing that the grievance and C.R.C.P. 106 processes satisfy due process."  [*Id.*]

---

[19]  While Plaintiff alleges that "the AG's Office has vigorously defended Quinn's conduct in directing CDOC to punish Toevs," this statement is not borne out by the allegations in the Amended Complaint.  [#19 at ¶ 111].

The Due Process Clause guarantees fair procedure, among other things.  A plaintiff may assert a § 1983 action for the deprivation by state action of a constitutionally protected interest in life, liberty, or property without due process of law.  *Parratt v. Taylor,* 451 U.S. 527, 537 (1981); *Carey v. Piphus,* 435 U.S. 247, 259 (1978) ("Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property").  A violation of procedural due process, as opposed to substantive due process, is actionable under § 1983 only when the state fails to provide due process.  "Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate." *Zinermon v. Burch*, 494 U.S. 113, 126 (1990).

The Supreme Court describes due process as "a flexible concept that varies with the particular situation," and weighs the following factors to "determine what procedural protections the Constitution requires in a particular case":

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Zinermon*, 494 U.S. at 127 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). Application of this test usually finds that the Constitution requires the state to provide some kind of hearing before it deprives a person of property. *Id.* at 127 (citations omitted).  However, a common-law tort remedy for erroneous deprivation or a post-deprivation hearing satisfies due process in other instances, such as when the state is responsible for the negligent loss of a prisoner's property—the state cannot be required to provide pre-deprivation safeguards because

the state could not predict precisely when such a loss would occur.  *Zinermon*, 494 U.S. at 129

(citing *Parratt*, 451 U.S. at 541).  The same is true for where a state prison guard intentionally

deprives a prisoner of his property acting not pursuant to established state procedure, but in

furtherance of a personal vendetta against the prisoner.  *Id.* at 130 (citing *Hudson v. Palmer*, 468

U.S. 517, 521, n.2, 532, 533 (1984) ("The state can no more anticipate and control in advance the

random and unauthorized intentional conduct of its employees than it can anticipate similar

negligent conduct.").

Plaintiff alleges that Defendants confiscated the *CPLP v. Herrera* exhibits without

sufficient process.  He further alleges that the deprivation "was not effected through random and

unauthorized conduct of a state employee," but "as part of an ongoing, state sanction, AG's

Office-defended activity."  [#19 at ¶ 141].  Plaintiff alleges in the alternative that any post-

deprivation hearing was "meaningless," because the *CPLP v. Herrera* exhibits were never

returned to him.  [*Id.* at ¶¶ 142, 143, 144].  Based on the allegations contained in the Amended

Complaint, I cannot conclude that Plaintiff can prove no set of facts that would show certain

Defendants acted to deprive him of his property without due process and that the process he

received was insufficient.

Rather, considering Plaintiff's allegations, the operative question is whether he was

entitled to a pre-deprivation hearing or only a post-deprivation hearing.  The state generally must

provide a pre-deprivation hearing before taking property where it is feasible to do so, regardless

of the adequacy of a post-deprivation tort remedy to compensate for the taking.  *Zinermon*, 494

U.S. at 132 (citation omitted).  However, post-deprivation remedies "might satisfy due process"

where a pre-deprivation hearing is "unduly burdensome in proportion to the [] interest at stake,"

in addition to where the state cannot anticipate and thus cannot prevent a random deprivation. *Id.* Therefore, determining the process due to Plaintiff requires understanding whether Defendants acted pursuant to a state policy or ultra vires.   If they acted pursuant to state procedure, and the state was in a position to provide for pre-deprivation process, the court must consider whether such process was out of proportion to the interest at stake.   *Zinermon*, 494 U.S. at 130 (citing *Hudson*, 468 U.S. at 534).   If Defendants' actions were random or unauthorized, the state was likely not in a position to provide pre-deprivation process, in which case, the court would assess whether CDOC's administrative grievance procedure and/or the review process afforded under C.R.C.P. 106 adequately satisfies Plaintiff's due process rights.   *See Mathews*, 424 U.S. at 335.

Neither of these inquiries is amenable to a Rule 12(b)(6) review.   Even if Defendants are correct that, under *Durre v. Dempsey*, 869 F.2d 543 (10th Cir. 1989), Plaintiff was only entitled to post-deprivation process regardless of the scenario, Plaintiff alleges that despite the outcome of the C.R.C.P. 106 review, CDOC only expunged the conviction from his record, and failed to return either the exhibits to him or him to an incentive status.   *Cf. Freeman v. Dept. of Corrections*, 949 F.2d 360 (10th Cir. 1991) (distinguishing *Durre* and finding Rule 12(b)(6) dismissal inappropriate on basis that prisoner alleged he could not access state's post-deprivation process and/or that process was inadequate).   Accordingly, I find that Plaintiff has adequately alleged that the process available to him was inadequate and recommend that the court deny the Motion as to this claim with respect to Defendants Barr, Dent, and Quinn, against whom I find Plaintiff asserts allegations of personal participation in the deprivation of his property.   Plaintiff implicates Barr and Dent as the officers who initiated the search and originally removed the

materials, and Quinn as the individual who apparently had the final say that Plaintiff was not authorized to possess those materials and never returned those materials even after the Court of Appeals reversed the district court.   Conversely, I recommend that this claim be dismissed as to Defendants Nordell, Reynolds, Foster, Ortiz, Will, and Burke, as the allegations aver only that they read the confiscated legal materials and/or awaited advice as to whether Plaintiff was entitled to keep those materials in his possession, and, as to Defendants Will and Burke, who prosecuted and convicted Plaintiff for and of the charge.

3.   *Fourth Claim for Denial of Right to Counsel*

Plaintiff asserts that Defendants violated his Sixth Amendment right to counsel by reading the privileged and confidential correspondence between him and Ms. Owen.  [#19 at 29-30].   Defendants argue Plaintiff fails to state a claim because he has no right to "full and unfettered contact" with his attorney, and that they read the Owen Letters and other correspondence pursuant to a legitimate penological interest in preventing the circulation of contraband.  [#28 at 31-32].

The Sixth Amendment states in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial…and to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  In *McNeil v. Wisconsin*, the Supreme Court explained that the right to counsel protected by the Sixth Amendment "is offense specific," and "does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information," and thus, the right "cannot be invoked once for all future prosecutions."  501 U.S. 171, 175 (1991).   *See also Texas v. Cobb*, 532 U.S. 162 (2001); *Davis v. United States*, 512 U.S.

452, 456-57 (1994) ("[t]he Sixth Amendment right to counsel attaches only at the initiation of adversary criminal proceedings"); *Al–Owhali v. Mukasey,* No. 07–CV–02214–LTB–BNB, 2010 WL 5651033, at *11–12 (D. Colo. June 17, 2010), *report and recommendation adopted in part sub nom, Al–Owhali v. Holder,* 07–CV–02214–LTB–BNB, 2011 WL 288523 (D. Colo. Jan. 27, 2011), *aff'd,* 687 F.3d 1236 (10th Cir. 2012). The Sixth Amendment does not attach to civil cases. *Turner v. Rogers*, 564 U.S. 431, 441 (2011).

Plaintiff does not allege that he had been charged with breaking the law or was otherwise involved in a criminal proceeding at the time Defendants read the correspondence between him and his attorney. It would appear then, that regardless of what purpose motivated Defendants in reading and confiscating Plaintiff's legal materials, there can be no Sixth Amendment violation because the protections contained in that Amendment were not applicable at the time of the alleged violation. *See Wolff v. McDonnell,* 418 U.S. 539, 576 (1974). Therefore, this court respectfully recommends dismissal of the Fourth Claim.

          4.       *Fifth Claim for Breach of Attorney/Client Privilege*

Plaintiff asserts that Defendants breached the attorney-client privilege he enjoys with Ms. Owen, in violation of his First Amendment rights, by reading the Owen Letters. [#19 at 30-31]. Defendants argue they searched Plaintiff's legal mail "for both contraband and plans of criminal activity," and that no constitutional violation resulted because their search was "reasonably related to valid penological interests of security, safety and maintenance of orderly prisons." [#28 at 34]. Defendants argue in the alternative that the Owen Letters are not protected by the attorney-client privilege because the "documents at issue…were copies of legal materials for another inmate's case." [*Id.* at 35]. Plaintiff responds that whether Defendants read his legal

mail in furtherance of a valid penological interest is a question of fact.  [#33 at 16-17].  Plaintiff further responds that the claim does not rise and fall on whether the exhibits to the *CPLP v. Herrera* complaint were protected by the privilege; rather, only through their review of the Owen Letters, privileged correspondence, did Defendants discover and then confiscate the exhibits. [*Id.* at 17].

The First Amendment, as incorporated by the Fourteenth Amendment, prohibits states from "abridging the freedom of speech."  U.S. Const. amend. I.  Mail is one medium of free speech protected by the First Amendment.  *See City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 427 (1993).  Established law provides that a prisoner's legal mail may be opened by prison officials only in the presence of the prisoner, and prison officials may require legal mail to be marked in a certain way so as to enable them to identify it as such.  *Wolff ,* 418 U.S. at 575–77.  Mr. Toevs asserts that Defendants' actions had a chilling effect on his speech.  *See* [#33 at 16].  Both sides analyze this Fifth Claim as one alleging that Defendants' actions interfered with Mr. Toevs' free speech rights under the First Amendment.  *See Al-Amin v. Smith*, 511 F.3d 1317, 1334 (11th Cir. 2008) ("[t]his is not a case where defendants censored inmates' mail or refused to deliver mail. Instead, defendants opened Al–Amin's attorney mail outside his presence before delivering it to him. The issue thus is whether defendants' [conduct] sufficiently chills, inhibits, or interferes with Al–Amin's ability to speak, protest, and complain openly to his attorney so as to infringe his right to free speech").  *See also Jones*, 461 F.3d at 359 (reasoning that the practice of opening attorney mail outside the inmate's presence "deprives the expression of confidentiality and chills the inmates' protected expression, regardless of the state's good-faith protestations that it does not, and will not, read the content of the communications.").

CDOC AR 300-38 provides:

<u>Restricted Inspection Mail</u>: All incoming and outgoing offender mail to or from a specified class of persons and organizations, which DOC employees, contract workers, and volunteers are prohibited from reading to protect confidentiality, but are permitted to inspect for contraband in the offender's presence.
…
The DOC shall ensure and facilitate offender access to counsel and assist offenders in making confidential contact with attorneys and their authorized representatives; such contact includes, but is not limited to uncensored correspondence. [4-4275] To be considered a confidential contact from an attorney, their authorized representative, or legal aid organization, the incoming mailing envelope must include the following:

a. Attorney's first and last name;
b. Attorney's registration, bar, or license number….;
c. Attorney's complete business address;
d. Mailing envelope must be clearly marked "PRIVILEGED" or "CONFIDENTIAL."

[#19 at ¶ 29].

Plaintiff alleges that all correspondence from Ms. Owen to him "was clearly marked 'Privileged and Confidential' and met all other requirements for protecting confidentiality prescribed by the CDOC ARs," and that he stored all correspondence from Ms. Owen in his legal box, and that the majority of that correspondence related to her representation of him in his clemency bid. [#19 at ¶¶ 31, 32]. Plaintiff also alleges that Defendants Barr and Dent read "word for word…each piece of paper in Toevs' legal box," and that Defendants Ortiz, Nordell, Reynolds, and Quinn read the Owen Letters. [#19 at ¶¶ 39, 53, 54]. Ultimately, all materials were returned except for the *CPLP v. Herrera* exhibits.

This claim is clearly not about Defendants' confiscation of the exhibits. Rather it concerns Defendants' alleged review of the substance of Plaintiff's correspondence with his attorney, correspondence that Plaintiff alleges he labeled according to CDOC ARs so that CDOC

employees would identify it as mail that they are "prohibited from reading [so as] to protect confidentiality, but are permitted to inspect for contraband in the offender's presence." [#19 at ¶ 29]. "While the inadvertent, negligent opening of legal mail does not violate the Constitution, the courts have not hesitated to find a violation where the mail has been read or where a policy of opening mail outside inmates' presence has been shown." *Hinderliter*, 814 F. Supp. at 68 (finding triable issue of fact where prisoner alleged officials undertook retaliatory conduct based on information which he asserts only could have been obtained from reading his legal mail). *See also Reneer v. Sewell*, 975 F.2d 258 (6th Cir. 1992) (holding summary judgment not appropriate where fact issue exists as to whether inmate's legal mail was actually read and whether action was retaliatory); *Proudfoot v. Williams*, 803 F. Supp. 1048 (E.D. Pa. 1992) (finding officer violated inmate's right of access to the courts when he opened inmate's legal mail and appeared to read it). Similarly, Plaintiff alleges Defendants retaliated against him for pursuing *Toevs v. Milyard* and communicating with Ms. Owen by reading correspondence between him and Ms. Owen, which resulted in officials removing him from incentive to segregation status and a disciplinary conviction, and rendered him ineligible for a clemency bid.

However, I do not find that all Defendants are implicated in the alleged violation. As an initial matter, Plaintiff alleges that only Defendants Barr, Dent, Quinn, Nordell, Reynolds, and Ortiz read the contents of his legal box and/or the Owen Letters. Therefore, this claim should be dismissed as to Defendants Will, Burke, and Foster. In addition, although Defendants do not raise this argument, the Third Circuit and the Second Circuit and district courts therein have held that "an isolated incident of mail tampering is usually insufficient to establish a constitutional violation," and "the inmate must show that prison officials 'regularly and unjustifiably interfered

with the incoming legal mail.'"   *Davis*, 320 F.3d at 351 (citations omitted).   And, the Second

Circuit and courts therein "have generally required specific allegations of invidious intent or of

actual harm where the incidents of tampering are few and thus the implication of an actionable

violation is not obvious on its face."   *Id.* (citations omitted).   This court could find no Tenth

Circuit case law adopting or rejecting this logic, but district courts within the Circuit cite these

cases favorably.   *See, e.g., Hale v. Ashcroft*, No. 06–cv–00541–REB–KLM, 2008 WL 4426128,

at *10-11 (D. Colo. Sept. 24, 2008); *Chambers v. Badsky*, No. 13–3114–SAC, 2014 WL

4261345, at *6 (D. Kan. Aug. 28, 2014).   I find that Plaintiff alleges only one instance in which

Defendants read his legal mail, and thus he cannot move forward with his claim without also

alleging some type of intent.   As with the retaliation claim discussed above, I find Plaintiff

supplies sufficient factual allegations that Defendants Barr and Dent acted with retaliatory

motives in reading his legal mail, nut fails to meet this pleading burden with respect to

Defendants Ortiz, Quinn, Nordell, and Reynolds.   Accordingly, while the conduct of these

Defendants may have violated AR 300-38, and "the opening and reading of an inmate's legal

mail without cause…cannot be condoned," *Chambers*, 2014 WL 4261345, at *6, Plaintiff has

not alleged the requisite intent to plead a constitutional violation.[20]   Therefore, I recommend that

---

[20] This court notes an order from a court in this District declining to adopt the recommendation of the magistrate judge that a motion to dismiss be granted based on the reasoning of *Davis v. Goord* and its progeny, observing that the defendants had not raised the argument in their motion.   *See Ybanez v. Scott*, No. 14–cv–01059–MSK–MJW, 2015 WL 1258290, at *4-5 (D. Colo. Mar. 17, 2015) ("the Defendants' motion did not raise the argument that a single instance of negligent application of AR 750–01 could not state a claim, and thus, it was inappropriate for the Magistrate Judge to reach that question").   This court is mindful of not making arguments for *pro se* litigants and represented parties alike, but nonetheless believes that in a lawsuit such as this one, which involves many defendants, claims, and theories of liability, and which has been pending already for no insignificant period of time, it acts in the interest of effective case

the court dismiss this action as to all Defendants acting in their individual capacity other than Defendants Barr and Dent.[21]

5. *Sixth Claim for Denial of Right to Privacy*

Plaintiff asserts he has a reasonable expectation of privacy under law "in the content of lawyer-client correspondence." [#19 at ¶ 162]. Plaintiff further asserts that the CDOC, by implementing administrative regulations, has created this expectation of privacy in properly marked legal mail, and he alleges that Defendants violated his right to privacy in violation of the Fourth Amendment. [*Id.* at ¶¶ 163-165]. Defendants argue that Plaintiff's "Fourth Amendment privacy rights have not been violated because the search and seizure of his mail was permitted to comply with the institutional needs and objectives of the prison facility." [#28 at 36]. Defendants also argue that the "seized documents" were contraband, and thus Plaintiff had no legitimate expectation of privacy in them. [*Id.* at 37].

---

management and judicial economy to winnow the Amended Complaint to a form best suited for entering discovery.

[21] With respect to Defendants' arguments, this court does not read the Amended Complaint to assert a challenge to AR 300-38 as promulgated. To the extent this court misapprehends the claim, and Plaintiff does challenge the reasonableness of AR 300-38, the court would still need undergo an analysis of factors as enunciated in *Turner v. Safley*, 482 U.S. 78, 89 (1987) (identifying factors relevant to whether a prison regulation is reasonably related to legitimate penological interests). Such an analysis is better suited for a motion for summary judgment. *See Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002) (Turner "requires courts, on a case-by-case basis, to look closely at the facts of a particular case and the specific regulations and interests of the prison system in determining whether prisoner's constitutional rights may be curtailed."). Indeed, in arguing they were motivated by a legitimate penological interest to read the Owen Letters and other contents of his Plaintiff's legal box, Defendants introduce questions of fact and invite the court to undertake a review of matters that are clearly outside the pleadings. *See Brown v. Williams*, 36 F. App'x 361, 363 (10th Cir. 2002) ("Prison officials may open an inmate's incoming legal mail to search for contraband in the presence of the inmate") (citation omitted).

The Fourth Amendment, which ensures a person's right "to be secure in their persons, houses, papers, and effects" from unreasonable searches and seizures, does not establish a right to privacy in prisoners' cells.  U.S. Constitution amend. IV; *Hayes v. Marriott*, 70 F.3d 1144, 1146 (10th Cir. 1995).  *See Frazier v. Zavaras*, No. 10–cv–02534–CMA–KMT, 2011 WL 4537001, at *5 (D. Colo. Sept. 30, 2011) (dismissing prisoner's Fourth Amendment claim based in part on prison officials removing legal material from his cell, noting the Tenth Circuit has "foreclosed any fourth amendment challenge to the search of a prison cell") (quoting *Dunn v. White,* 880 F.2d 1188, 1191 (10th Cir. 1989)).  *See also Herd v. Hartley*, No. 1:12–cv–01674–AWI–BAM (PC), 2014 WL 1333995, at *3 (E.D. Cal. Apr. 3, 2014) ("The issue of whether a prison official can open legal materials outside of an inmate's presence is more appropriately considered under the First Amendment") *reversed and remanded by Herd v. Hartley*, 617 F. App'x 825 (9th Cir. 2015) (determining plaintiff's allegations stated a First Amendment claim that required an answer).  Additionally, a prison official's "failure to adhere to administrative regulations does not equate to a constitutional violation."  *Malik v. Kindt*, 76 F.3d 393, 1996 WL 41828, at *2 (10th Cir. Feb. 2, 1996) (rejecting federal prisoner's claim based on Code of Federal Regulations).[22]  I recommend that the court grant the Motion as to this claim, as Mr. Toevs's concerns are better addressed under his Fifth Claim for violation of the First Amendment.

## CONCLUSION

For the reasons set forth herein, this court respectfully RECOMMENDS that:

---

[22] Plaintiff cites *United States v. Gordon*, 168 F.3d 1222 (10th Cir. 1999) in his Response. However, in *Gordon*, the Tenth Circuit dealt in relevant part with "unprivileged incoming and outgoing prison mail," and thus did not reach the question of Fourth Amendment protection as to privileged legal mail.  Furthermore, the court suggested that letters that enter the mail system may not enjoy Fourth Amendment protection because the Amendment does not protect items "knowingly exposed to the public."  *Id.* at 1228.

(1)     The Motion be reviewed as a Motion for Summary Judgment for the sole purpose of determining whether Plaintiff has exhausted his administrative remedies, and that summary judgment be GRANTED as to Claims Two, Seven, and Eight, on the basis of failure to exhaust, and DENIED as to Claims One, Three, Four, Five, Six, and Nine, without prejudice;

(2)     The Motion be GRANTED for failure to state a claim as to Claims Four, Six, and Nine and DENIED as to Claims One, Three, and Five;

(3)     Claim One proceed as to Defendants Barr, Dent, and Will in their respective individual capacities;

(4)     Claim Three proceed as to Defendants Barr, Dent, Will and Quinn, in their respective individual capacities;

(5)     Claim Five proceed as to Defendants Barr and Dent, in their respective individual capacities; and

(6)     All claims as to all other Defendants be DISMISSED.[23]

---

[23] Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to

DATED: January 31, 2017                    BY THE COURT:


                                           s/Nina Y. Wang_____
                                           United States Magistrate Judge

---

appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).